UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

James Scott Altman,                :    Case No. 2:08-CV-13332
                                   :
        Petitioner,                :
                                   :
vs.                                :
                                   :
Debra Scutt, Warden,               :
                                   :
        Respondent.                :

**ORDER**

## Overview

Petitioner James Scott Altman was convicted by a Michigan state jury of second

degree murder in October 2005.  He was subsequently sentenced by the trial court to a

term of not less than 18 years nor more than 60 years imprisonment.  His direct appeal

of his conviction and sentence was denied by the Michigan Court of Appeals in its

September 11, 2007 decision.  The Michigan Supreme Court denied leave to appeal

that decision.

Altman filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254

on August 1, 2008, raising three claims for relief.  (Doc. 1)  The state responded on

February 13, 2009 (Doc. 5), and Altman filed a reply (Doc. 8).  On June 25, 2009, prior

to any decision on his petition, Altman notified the district court and Respondent that he

had filed a motion in Michigan state court, seeking to vacate his conviction on the basis

of newly discovered evidence.  (Doc. 10)  The district court held Altman's petition in

abeyance while he exhausted this claim in the state courts.  The post-conviction trial

court held a three-day evidentiary hearing, and the parties filed post-hearing briefs.  The

trial court denied Altman's motion to vacate. Both the Michigan Court of Appeals and the Supreme Court denied review. Altman then returned to federal district court and filed an amended petition and brief. (Doc. 16) The state filed its response (Doc. 25), and Altman filed a reply. (Doc. 27)

**Factual Background**

In the late evening of September 28, 2004, Altman drove his girlfriend Christina Fisher (referred to as "Tina" throughout) to a local emergency room in Midland, Michigan. Tina had a skull fracture on the back right side of her head. She was unconscious, and was bleeding profusely. After emergency room staff examined her, she was transferred to another hospital in Saginaw, Michigan, where she underwent surgery that evening to relieve pressure on her brain. Tina died in that hospital on October 8, 2004 without regaining consciousness.

When Altman arrived at the Midland hospital, emergency room staff came out to assist him. He told them that Tina had jumped out of his moving car. The Midland County Sheriff was contacted about the incident, and several officers arrived at the hospital shortly after Tina had been transported to Saginaw. Lt. Thomas was shift commander that night, and he was the first to arrive at the hospital. He was joined by Deputies Kozak, Millard, and Harnois. Thomas had just started to talk to Altman when Deputy Kozak arrived, and Thomas asked Kozak to get Altman's statement. Deputy Kozak later testified at the preliminary hearing that he spoke to Altman both outside and again inside the hospital building, but no formal statement was obtained that evening from Altman. Altman told Kozak that he and Tina left Tina's house on Hull Road to go to a McDonald's in Midland. While driving down Hicks Road, Tina opened the

passenger door.  Altman reached across the seat, shut the door, and grabbed Tina's seatbelt.  Tina then flung the door open again and rolled out of the car.  Altman stopped the car and managed to get Tina into the passenger seat, then drove to the hospital.  Kozak showed Altman a map of the area to help him explain the route they took that evening.  Kozak's incident report stated that Altman told him he was driving 35-40 "on Hicks Road," but did not say anything about the speed of the car at the moment that Tina rolled out.

Kozak suspected that Altman was under the influence, and asked if he had been drinking.  Altman told Kozak he had a beer some hours before.  He willingly took a field sobriety breath test which measured .02 BAC, well below the legal limit.  Kozak assigned another deputy to obtain a search warrant to authorize taking a blood sample after Altman refused to voluntarily submit one.  Deputy Millard escorted Altman to another facility for that purpose.  The sheriff's office also impounded Altman's vehicle that evening.  It was taken to an impound building, where Deputy Harnois took photographs of the interior and exterior.

While at the Midland emergency room, Lt. Thomas collected Tina's clothes, which were in a plastic bag.  He was not given her sweatshirt that night.  Lt. Thomas asked Deputy Menge to go to Tina's home and then to trace the route Altman described taking that evening.  Menge found nothing amiss at Tina's home.  He located a series of tire and skid marks and a pool of blood on Hicks Road, an unpaved dirt/gravel road not too far from Tina's home.  Deputy Harnois and Lt. Thomas met Menge on Hicks Road that night.  Menge took photographs of the tire and skid marks, and an area of pooled blood found on the road.  Menge said he found two sets of skid marks that were about a

tenth of a mile apart.  The blood was found near the second set of marks.  Lt. Thomas prepared a field sketch of the marks and blood pool, and the officers then took measurements.  The officers then left the scene and did not secure it to prevent public access to the road.

Lt. Hall was on duty in the afternoon of September 30; he had not been involved with the initial investigation and was not aware of the incident involving Tina.  Lt. Alvord, his shift supervisor, told him that Altman would be coming to the station to get a release form for his impounded car, and asked Hall to take Altman's statement.  The written transcript of that statement (Ex. B to Altman's original petition) figures prominently in Altman's claims in this case.  Lt. Hall spoke to Altman before the recording began, but he stopped the questioning and left the room to familiarize himself with the initial incident reports prepared by the deputies.  Hall returned and began the recorded interview at 6:40 p.m.  After several back-and-forth exchanges in which Lt. Hall challenged many of Altman's responses, he asked:

> Q:   So then the door opened on the passenger side.  Did you see her open it?
>
> A:   No.
>
> Q:   Was it dark outside?
>
> A:   Yes.
>
> Q:   And then what happened?  You could obviously hear the door open because of the wind noise.
>
> A:   Yes.
>
> Q:   (Cough) how fast were you driving?
>
> A:   I'm estimating 40,45.

-4-

Q:     OK.  Then what you'd do?

A:     I stopped.

Q:     How far behind your vehicle was she lying in the roadway?

A:     20, 25, 30 feet.  I had to back up.  I know that.

Q:     So you're guessing, three car lengths?

A:     Probably. These are guesses.

Q:     So at 45, 50 miles per hour, I'll say 35 miles an hour. She opens up the
       door, jumps out, takes you half a second to realize what just happened.

A:     Um Hmh (Affirmative).

Q:     You hit the brakes.

A:     Um Hmh (Affirmative).

Q:     You stop.

A:     Um Hmh (Affirmative).

Q:     She's only three car lengths behind you?

A:     Officer, like I said. This was traumatic. I am taking a total guess at that. I'm
       not an expert.

Q:     So you back up to her.  Do you strike her with the vehicle?

A:     No.

Q:     How do you know that you didn't strike her?

A:     I know that I didn't.

Q:     Where was she in the road?

A:     I was looking back.  Her feet were laying.

Q:     Was she on the pavement or not?

A:     Un Hnh (Negative).  There wasn't pavement.

-5-

Q:      Was she on the travel portion of the roadway or not?

A:      Yes.

(Doc. 1, Ex. B at 5-6)

Lt. Hall also asked Altman about his relationship with Tina, and whether Tina was suicidal or had taken any drugs that day.  Altman said that Tina had been suicidal two days before the incident, but they did not have any real problems in their relationship. Altman told Hall that he took several medications for various conditions, including Adderall for attention deficit disorder.  Altman said that he had confronted Tina about taking his Adderall a couple weeks before the incident.  He said that Tina smoked marijuana on occasion but he had never seen her take other drugs.  He denied pushing Tina out of the car.  Lt. Hall ended the interview at 7:12 p.m., and Altman's car was apparently released to him.  Lt. Hall testified at trial that he did not believe Altman's story, and he contacted a superior that night to relay his concerns.

The next day, October 1, Lt. Wirth was called to the captain's office to be briefed about the incident, and he opened a detective's investigation.  Lt. Wirth was in charge of the investigation from that point forward.  He took possession of Tina's sweatshirt from the Saginaw hospital, which was in a plastic bag when he picked it up.  Wirth took the sweatshirt to the Midland Law Enforcement Center, where it was dried and photographed.  It was later taken to the state crime lab.  Lt. Alvord and Sgt. Woods went back to Hicks Road on October 2, to videotape the scene and take additional photographs.  Public access to the road had not been restricted since the night of the incident, however.

Tina died on October 8.  Dr. Kanu Virani, a medical examiner, performed an

autopsy.  When he performed the autopsy and wrote his report, Virani had been told

that Altman claimed that Tina had jumped out of his moving car.  Virani concluded that

she died from blunt force trauma to her head, and that her death was due to homicide,

and not to accident or suicide, because her injuries were not consistent with someone

who had jumped or rolled out of a moving vehicle.

**Procedural History**

Altman was eventually charged with Tina's murder in a one-count open murder

information.  He was initially arraigned by the Midland County district court on

December 15, 2004 while he was being hospitalized.  (The transcript of the arraignment

includes a statement by the prosecutor that when Altman learned he had been charged,

he attempted to take his own life.  See Doc. 6-3 at 6.)  Altman was bound over to

Midland County Circuit Court, where Judge Hart conducted a preliminary examination

on March 5, 2005.

Dr. Bicknell, the Midland emergency room doctor, and Dr. Virani testified at the

preliminary examination, along with several of the sheriff's deputies.  Dr. Bicknell

testified that when Altman arrived at the emergency room, he told staff that Tina jumped

out of his car.  Bicknell was asked if her injuries were consistent with that scenario; he

responded: "Seems unlikely to me."  (Doc. 6-4 at 9)  Deputy Kozak testified about his

initial interactions with Altman that night at the hospital.  Dr. Virani explained his autopsy

findings, and the basis for his conclusion that Tina's death was a homicide.  In addition

to Tina's head wound, he noted small healing abrasions on her right shoulder, right

groin area, right thigh, the back of her right knee, and her right leg.  She had several

linear skull fractures which intersected each other, which Dr. Virani said was indicative

-7-

of a great deal of force that had been applied to her head.  He stated that if someone

was standing up and then fell on the back of her head on a hard floor, it would not be

enough to cause the kind of head injury he saw in Tina.  (Doc. 6-4 at 33-34)  He

explained the primary basis for his conclusions was the fact that her only major injury

was the head wound.  The impact that caused it was so severe that the force used was

far more than a human fist could inflict.  On cross-examination, Dr. Virani said that he

met with Detective Wirth the day of the autopsy and again sometime later, before he

wrote the autopsy report.  Det. Wirth showed Virani photographs, and asked if Tina's

pattern of injuries was consistent with someone falling out of a car traveling 40-45 mph

on a gravel road.  Dr. Virani believed Tina's injuries were not consistent with that

scenario.  Defense counsel asked if it would make any difference if the car had slowed

down, or if the car was decelerating when Tina went out the door, based on Altman's

description to the officers and the field sketch showing skid marks.  Virani said it would

not matter whether the car was moving at 30, 40 or 45 mph, due to the absence of a

pattern of injury he would expect to see on someone who rolled out of a moving vehicle.

He would expect to see several areas of external injuries, particularly on the elbows or

knees, on the back, or wherever the body would come into contact with the road

surface.  And if the car was moving more slowly, the skull fracture wouldn't have

occurred unless her head hit an object like a large stone; even then, the object would

have had to hit only her head and not any other part of her body, which Virani thought

was highly unlikely.

   Lt. Hall testified about taking Altman's statement on September 30.  Using the

written transcript, Hall confirmed that Altman responded "Um Hmh, in the affirmative"

when Hall stated that Altman was driving around 40 mph when Tina jumped out of the car.  (Doc. 6-4 at 55)   Sgt. Harnois testified about the photographs taken that night on Hicks Road, which he described several times as a "gravel roadway."  (Doc. 6-4 at 63) He also described his inspection of Altman's vehicle, both at the hospital parking lot and at the impound building.  Det. Wirth identified the photographs he took at the police evidence locker.  The photos included pictures of Tina's sweatshirt.

Defense counsel, Mr. Isles, argued that the evidence was insufficient to establish probable cause.  He noted that Altman's car was not carefully checked to see if there was blood on the back quarter panel of the car.  He theorized that if Tina rolled out of the car while it was moving slowly (10-15 mph), she could have hit her head on the wheel well of the car, and that the contusions noted on her autopsy were all on the right side of her body.  He further argued that Dr. Virani based his homicide opinion on incorrect information given to him by the sheriff's deputies, because Altman never admitted that his car was traveling at 40-45 mph at the point that Tina jumped.

The trial court found there was probable cause to hold Altman for trial on an open murder charge.  The court rejected Altman's arguments about the weaknesses in Dr. Virani's opinion, and his contention that Lt. Thomas' field sketch supported Altman's version of the incident.

On April 29, 2005, trial counsel Isles filed a motion to quash the information and to dismiss the murder charge.  (The Court cannot locate the written motion in the record.)  Attorney Daniel Duke substituted as trial counsel for Altman two weeks later, on May 13, 2005.  Circuit Court Judge Thomas Ludington held a hearing on May 26, 2005 (Doc. 6-5) at which attorney Duke argued the motions.  The transcript of that

hearing indicates that Altman's motions argued that the preliminary hearing testimony did not establish probable cause.  He also raised objections about the fact that his car had been impounded, released two days later, and then seized again after it had been cleaned, potentially depriving Altman of exculpatory evidence.  Counsel then asked the trial court for additional time to consult with an accident reconstruction expert prior to submitting the motions to quash and to dismiss for decision.  The state also had an expert who had not completed his work, and the trial court urged the parties to complete any necessary investigation so that it could rule on the motions.   A September 20, 2005 entry on the trial court docket sheet is described as "Opinion (Defendants' motion to quash information and Defendants' motion to dismiss and request for jury instruction)." The Court cannot locate that opinion the record, but the motions were obviously denied.

Altman filed a motion in limine on September 7, seeking to exclude the trial testimony from the state's proposed accident reconstruction expert, Trooper Robbins, and from Dr. Virani.  The trial court held a preliminary Rule 104 hearing on October 7 at which both proposed witnesses testified and were cross-examined by defense counsel. (Doc. 6-7)  At the end of the testimony, the court asked trial counsel if he had any Rule 702 objections to these witnesses.  Duke responded that he had no objections under that Rule, but stated that the hearing testimony was very helpful to him in understanding the bases for their opinions.  (Id. at 38)  The court then ruled that the two experts would be permitted to testify.

**Altman's Trial**

Jury selection took place on October 11.  The next morning, outside the presence of the jury and prior to opening statements, the trial court heard arguments on

-10-

the state's motion in limine seeking to admit a letter Tina had written sometime between July 2004 and September 28, 2004.[1]  The letter was addressed to Altman, was undated, hand-written, and eleven pages long.  Tina's mother found it in Tina's home after she was injured, and gave it to the police.  There was no evidence that Altman had ever seen the letter.  Based on a discussion about the letter that took place at the close of the October 7 expert hearing, the letter apparently described an incident where  Altman physically assaulted Tina, and another incident that Altman's counsel described as trying to "... scare her and another person with a car, like, driving at her and ... maybe not intending to actually hit them, but at least scare them.  And then I think there's also some other information in there ... like threats or that Mr. Altman had threatened to kill her at different times during their relationship." (Doc. 6-7 at 46-47)   The trial court preliminarily ruled that three short excerpts from the letter would be admitted at trial, but the rest (including the incidents of Altman allegedly threatening or assaulting Tina) would not.  (Doc. 6-10 at 15-16)

Following opening statements, the state's first witness was Tina's mother, Bonnie Jones.  She testified that at the Saginaw hospital while Tina was undergoing surgery, Altman said that Tina had unbuckled her seat belt three times that night, and each time Altman had reached over and re-buckled it.  Tina then unbuckled it a fourth time and jumped out of the car.  Jones said she could not understand how someone could re-buckle the passenger's seat belt while driving.  She also described going to Tina's house a day or two after the incident, to clean and arrange things for Tina.  She did not

---

[1] The parties apparently agreed on this date range based on events described in the letter.

-11-

see any blood stains or signs of anything unusual at the house. She and her

granddaughter found the hand-written letter, which Jones read and gave to the police.

Jones read aloud to the jury the three excerpts that the trial court held were admissible:

> (1) "I know you probably scoff at my use of the – using my dearest, but if
> you could only begin to understand how bad I hurt, have been hurting, and
> will continue to hurt for the rest of my life, you would allow me to live the
> rest of my life remembering how happy and in [– it looks like] love we
> were. You are angry but you hurt for what? A week maybe two. I have
> been hurting since April 6th when you first accused me of doing something
> behind your back."

> (2) "Sherie goes into your hospital room and again when you told me to
> leave so you and her could have some private time, I should have known.
> I should have listened to Kimberly and moved you out then. But I thought
> you loved me and we would work it out. But you lied to me then. You
> didn't really love me. ..."

> (3) "You have been stressed and forgot about the horses. You don't want
> anything to do with them. You've even begun to forget about me. Each
> night you drink, but won't say why. You go to Sherie's after work and do
> house and yard work while ... I try to keep up on my own at the house.
> You have – you come home at eleven p.m. right when I'm going to bed
> and then threaten me that you'll just go to town because you didn't want to
> drink alone or you're already drunk and want some pills."

(Doc. 6-10 at 47-48) Jones identified "Sherie" as Sherie Altman, Jim Altman's ex-wife.

The state next presented testimony from the eight Midland County sheriff's

officers who were involved in investigating the incident. Deputy Millard described the

field sobriety tests and preliminary breath test he conducted on Altman, and he obtained

the search warrant for a blood sample. Millard noticed some blood on one of Altman's

shins, but said there was none on his face or hands. Lt. Thomas described being called

to the Midland emergency room, and joined a short time later by Deputies Kozak and

Millard, and Sgt. Harnois. Thomas spoke briefly to Altman, then Kozak arrived and

questioned Altman. Thomas asked Dr. Bicknell if Tina's injuries were consistent with

-12-

someone falling from a vehicle. He said that Dr. Bicknell told him that night: "Yes, they were." (Doc. 6-10 at 79) The deputies were not yet sure precisely where the incident happened based on Altman's initial description. Thomas asked Deputy Menge to go to Tina's house and then start checking the area. Later that night, Thomas and Menge (joined by Sgt. Harnois) met on Hicks Road, where Thomas drew the field sketch and asked Menge to take photographs. Thomas described the blood pool and drag marks they observed, and said the blood pool was close to the passenger-side tire mark they saw on the road. Thomas also identified Tina's clothes that he retrieved from the emergency room that night (jeans, belt, boots, underwear, and socks.)

Sgt. Harnois testified about impounding Altman's car that night, and taking photographs of the vehicle at the impound building. He described the car as dusty, but he saw no damage to the exterior. Harnois then went to Hicks Road and helped Lt. Thomas take measurements. The photographs taken that night show what several witnesses described as a set of heel marks going from the side of the road and through the blood pool, as if someone had been pulled by their upper body with their heels dragging behind, from the side of the road toward the center. Deputy Kozak testified that Altman told him at the emergency room that he was traveling about 35-40 miles per hour on Hicks Road. (Doc. 6-10 at 147) Kozak confirmed that Altman did not say he was driving at that speed when Tina jumped out of his car. On cross-examination, defense counsel Duke re-emphasized that point: Kozak specifically acknowledged that he did not ask Altman how fast he was going when Tina left the car.

Lt. Hall then described taking Altman's statement on September 30, and said that his suspicions about Altman's story led to his phone call to his superior after that

-13-

interview. The tape recording of Altman's statement was then played for the jury. Detective Wirth testified about his initial involvement in the investigation following Hall's interview. He retrieved Tina's sweatshirt from the nursing supervisor at the Saginaw Hospital. He took the shirt to the Midland sheriff's department where it was dried and photographed, and later it was taken to the state crime lab. Several photographs of the sweatshirt were admitted as trial exhibits, including two that are specifically described as the "back of the sweatshirt." (Doc. 6-10 at 176-178) Wirth also took photos of Tina in the Saginaw hospital, and he noticed that she had no injuries to the back of her hands. He thought that was unusual if she had in fact jumped or fallen out of a moving car.

The second day of testimony was held on October 17. (Doc. 6-11) The state presented Dr. Bicknell, the emergency room physician on duty when Tina arrived at the Midland ER. He testified that Altman came into the hospital and asked for help getting Tina out of his car; Altman told the staff that Tina had jumped out of the car when it was traveling about 40 mph. (Doc. 6-11 at 7) A CT scan revealed a skull fracture and bleeding in her brain, but no other major injuries or broken bones. Dr. Bicknell had treated many patients with injuries after falling off motorcycles or being ejected from moving vehicles, and he testified that Tina's injuries and her appearance were not consistent with her jumping out of a moving car on a dirt/gravel road. He told Det. Wirth a few days later that he did not think Tina had jumped from a moving vehicle. Other witnesses that day included several of Tina's coworkers. Nancy Brackett testified that earlier on the day of the incident, Tina had left work crying and upset, after getting a telephone call from Altman. Brackett also said that Tina had tried to persuade Altman to stop taking drugs.

-14-

Tina's neighbor, Adelbert Vaughn, testified that he talked to Altman about two days after the incident.  Altman told Vaughn he was driving about 40 miles per hour when Tina undid her seat belt.  Altman reached over to buckle it, after which Tina unbuckled the belt again and jumped out of the moving car.  Kimberly Megoran, who had known Altman for approximately 9 years, testified that Altman told her he was going about 40-45 miles per hour at the time.  Megoran also testified that there was "lots of drama" in Tina's relationship with Altman.  Pam Kozubal, another neighbor of Tina's, said that Altman told her that he was driving about 40 miles per hour when Tina jumped out of the car.  She also testified that Tina had threatened to commit suicide on two occasions while Kozubal was in Tina's presence.

Dr. Gerald Schell was the neurosurgeon who operated on Tina at the Saginaw hospital in the early morning of September 29, to try to relieve pressure on her brain.  He testified that Tina had severe brain swelling and a hemorrhage on the right side of her skull.  He thought it unlikely that her pattern of injuries were caused by exiting a moving vehicle.  He said that someone who fell off a bicycle and hit their head on a concrete curb might sustain the type of serious skull fracture he observed in Tina, what he called a "pretty isolated head injury."  (Doc. 6-11 at 139-140)  But he had not seen such a injury in a "high speed car accident" where someone was ejected from the vehicle.  (Id.)  On cross-exam, defense counsel confirmed that Dr. Schell did not know how fast Altman's vehicle was traveling when Tina jumped out of the car.  He also agreed that if an object (such as the car door) was "traveling at a sufficient speed that's hard enough [and] hitting someone in the back of the head [could] cause this type of injury."  (Id. at 143)

-15-

Following Dr. Schell's testimony and excusing the jury, the court discussed with both counsel the arrangements for the jury view scheduled for the next day. Defense counsel confirmed that he did not generally object to the view, but asked that the jury be specifically told that the placement of markers or cones on the road to indicate where the deputies found certain tire and skid marks and the blood pool, would be approximations and not an exact location. Prosecutor Wolsh agreed. The trial court also discussed how the markers would be placed on Hicks Road; the court believed that the location of the blood pool could be established "with some level of [precision]" based on the field diagram and supporting testimony. Prosecutor Wolsh wanted to indicate the beginning of the skidmark and the other marks, "just to give the distance relationship." (Id. at 153) Defense counsel agreed that these arrangements were reasonable.

The next morning, the trial court again discussed with counsel the final arrangements for the jury view. Prosecutor Wolsh explained that Lt. Thomas was at Hicks Road that morning to place the marker cones in accordance with the measurements he recorded on his field sketch the night of the incident. Altman's car was being brought to the scene and would be placed at the start of the skid marks noted on the field sketch. (Doc. 6-12 at 3-9) With the jury re-convened, the state then presented testimony from two nurses who worked at the Midland emergency room, and who helped treat Tina when she first arrived that night. They both testified that in their opinion, Tina's injuries were not consistent with Altman's claim that she jumped out of a car moving at 40 mph. They each said there was no dirt or gravel in Tina's head wound, that her clothes were not torn or dirty, and that she had no other injuries consistent with jumping out of a moving car. Defense counsel objected to Nurse

-16-

Kalahut's opinion testimony, but did not object to Nurse Schlaack's.  On cross-examination, Nurse Kalahut conceded that if the incident happened at a different speed, it could change her opinion.  (Id. at 22)  Michelle Glen, a state crime laboratory toxicologist, then testified about the results of Tina's urine drug screen and Altman's blood test from the sample taken the night of the incident.  Tina's test was positive for "fairly high" levels of cannabis, amphetamine and cocaine metabolites.  (Id. at 33-34) Altman's test was positive for amphetamine and cocaine metabolites.  The toxicologist agreed that Adderall is an amphetamine.[2]

Following Glen's testimony, the trial court explained to the jury the arrangements for the view of the scene.  He stressed that the view is not evidence, but was intended to assist the jury in applying the testimony and evidence presented in the courtroom.  Lt. Wirth described the route the jury would take.  The prosecutor displayed a map with a red dotted line representing the route Altman took that night, and that the jury would follow.  The prosecutor also referred to a "blue dotted line, that represents – well, never mind what that represents right now."  (Doc. 6-12 at 47)  The trial court instructed the jury about the purpose of the view, and reminded them to follow the courtroom rules while on the trip and not to discuss the case among themselves or with anyone else.  If they had questions, they were to submit them in writing to the court, who would discuss them with the attorneys and decide if answers could be provided.  (Id. at 53-58)

The jury then traveled in a bus from Tina's house along the route that Altman described taking that night, to the scene of the incident on Hicks Road, and then to the

---

[2] Altman told Lt. Hall during his recorded interview that he was prescribed Adderall for ADHD.

-17-

Midland emergency room.  While they were on Hicks Road, the trial court explained to

the jury that "... the commencement cones adjacent to the vehicle are the

commencement point of the skid marks reflected on the diagram which has been

marked as Exhibit 160.  They follow to the far end, the cones, of the location of the

shoulder of the roadway which would be the approximate location of the bloodstains

that are reflected in that diagram." (Id. at 59-60)[3]

The next trial day, October 19, 2005, Lt. Wirth again took the stand by stipulation

of counsel.  The court informed the jury that Wirth would provide information in

response to written questions submitted by two of the jurors that the court received

during the view.  The questions were:

1.  Has road been re-graveled since the accident?

2. Was the car parked where the skid marks started?

(3) Had there been gravel work done on the road prior to accident?  ex:

putting down new gravel or spraying road [sic]?

(4) What was the weather the day of accident and day after?  Any rain

prior to accident?

(Doc. 26-15 at 5-6)

Lt. Wirth testified that he obtained weather reports for the Saginaw area for

September 27-29, 2004.  On the 27th and 29th there was no rain, and on September 28

there was .007 inches of rain.  Temperatures were in the low 60's during the day and

dropped to the low 50's to high 40's at night.  Lt. Wirth also contacted the Michigan

---

[3] Exhibit 160 is Lt. Thomas' field sketch of Hicks Road.

-18-

Department of Transportation for information about road work done on Hicks Road. MDOT reported that the road had been graded on September 1 and brined on September 2, 2004, and again on September 8 and 9, 2005.  Lt. Wirth offered that the road surface seemed harder to him in October 2005 during the jury view than it had in the fall of 2004 when he visited Hicks Road after the incident.

Timothy Robbins, a state police officer with specialized training and experience in accident reconstruction, was the state's next witness.  Robbins began work on the case in May 2005.  Robbins examined the photographs and the field sketch done by Lt. Thomas, and performed skid tests on Hicks Road to attempt to determine the speed at which Altman was traveling the night of the incident.  He believed that the officers on the scene that night were mistaken in labeling one of the tire marks as a skid mark; Robbins believed the photos showed this mark was an acceleration mark.   A mistake in labeling the marks and the measurements taken between them would make it impossible to estimate Altman's speed.  Nevertheless, Robbins performed several different calculations (which he described in his testimony) and arrived at an opinion: at the point where he believed the photographs showed skid marks starting, Altman's car was traveling at approximately 43 miles per hour.  The photos taken at the scene that night showed more loose gravel present on the road than Robbins saw on his visit in June 2005, and more loose gravel would result in a lower speed estimation.  Robbins ultimately opined, based on his interpretation of the available documentation of the scene that night and his vehicle testing, that Tina did not jump out of Altman's vehicle.

The state's next witness was Kyle Ann Hoskins, a forensic scientist (microchemist) with the Michigan State Crime Laboratory.  She first became involved in

-19-

the case on October 21, 2004 when she examined Tina's clothes.  She found blood and gravel on the heel of Tina's left boot, which was consistent with the photograph taken the night of the incident showing drag marks running perpendicular to the road, through the blood pool and towards the center.  Tina's belt buckle was not scratched and very clean, which Hoskins believed was inconsistent with a claim that Tina jumped out of a moving car on a dirt/gravel road.  Her wristwatch was still working when Hoskins first saw it.  Tina's sweatshirt was soaked with blood, and Hoskins believed that a V-shaped bloodstain pattern on the back indicated that Tina had been sitting up for some period of time after the bleeding from her head began.  Hoskins believed that the sweatshirt became soaked with blood before it was exposed to any dirt or gravel, not vice versa, because dirt was adhering to the blood on the back of the shirt and on the right elbow. Tina's jeans had no rips or tears, and the belt itself exhibited only normal wear and tear.

Hoskins also visited Tina's home on October 26, 2004 (approximately a month after Tina was injured) to look for blood stains or signs of a struggle.  She found nothing there.  She inspected and photographed Altman's car, which had been re-impounded by the sheriff when she saw it.  The car had been cleaned, but there were visible blood stains on the driver's seat belt and the center console.  She used a chemical enhancer to look for other blood stains that may have been cleaned, but found no evidence of such in the back seat or in the trunk.  The photographs of Altman's car taken in the sheriff's impound building on the night of the incident showed significant blood stains on the lower half and the lumbar regions of the passenger seat, but nothing on the headrest or the top half of the seat.  Significant blood stains were also seen in the crease between the passenger seat and the center console, on the running board, and

-20-

on the floor.  These patterns indicated that the victim was not sitting up in the car but was lying or slumped down. She also examined some of the photographs taken by the sheriff's deputies on Hicks Road the night of the incident.  She identified two pools of blood on the road that were shown in the photographs, with drops of blood outside the parameters of the pools.  She believed that whoever was bleeding was sitting up at one point, which would explain the drops between the pools.  The drag marks seen in the photographs came out of the first pool and towards the center of the road.

Based on the evidence she reviewed and her observations, Hoskins ultimately opined that Tina did not jump or fall out of a moving vehicle.  She explained:

> The blood pattern on the victim's clothing and the actual condition of her clothing indicates to me that that did not occur.  Her clothing would have been ripped and torn. Gravel would have been imbedded in it.  There would have been significant changes in one garment if not all of her garments.  Not one single garment is altered by the course of the road, and it would have been.  There's no doubt in my mind.

(Doc. 6-13 at 96)  On cross-examination, she was asked if her opinion would differ if the car was going much slower than 40-45 mph.  She responded: "I would still expect to see some marring on the metallic pieces and some tearing regardless of the speed of the car.  Even at 5 or 10 miles an hour, when a human body goes out of a vehicle or is pushed against gravel, you will see evidence of that on the clothing."  (Id. at 109)  She was also asked whether the photographs taken at the scene were sufficient for her to do a tire track analysis; she said they were not because they did not indicate the scale of the tracks, and the photos were taken from above rather than horizontally.  She also described several of the photos as being too distant, and that she would want better

close-up pictures before rendering an opinion about the type of tire that made the tracks.

The state's last witness was Dr. Virani. He concluded that the impact to the right lower side of Tina's head was the cause of all her skull and brain injuries. He testified that during the autopsy, he noted a small purple bruise on her right shoulder which he believed was the same age as her head wound, but no other contemporaneous injuries. A bruise seen on the outer right buttock looked fresh, but he believed it happened as a result of her hospitalization. He described several abrasions that were healing or almost completely healed, which he believed pre-dated the head injury. He completed Tina's death certificate by concluding that the cause of her death was blunt force head trauma with complications, and the manner of her death was homicide. He could not identify the specific object that injured her head, but he believed it had a broad, smooth surface and was not sharp or pointed. Whatever impacted her head did so with a very large amount of force, enough to fracture her skull at impact and fracture her eye sockets due to kinetic energy transfer. He believed Tina's head was "mobile" at the time it was impacted; in other words, her head was not stationary or held against something like a wall and then hit; he said that her head could move upon the impact.

At the time he rendered his opinion on manner of death, Dr. Virani was told that Tina jumped or fell out of a vehicle moving at about 40 mph on a gravel road. He concluded that her death was a homicide because:

> ... when a person is falling off the moving vehicle at that speed on a dirt or gravel road, it is not going to have that hard impact only on the head. The body is either gliding on the surface or rolling on the surface leaving a lot of visible injuries on the contact areas which would be the elbows, the

> knees, the hip area, which all come into contact - forehead
> [sic].  I did not see any pattern of the injury consistent with a
> human body falling at that rate of speed from a vehicle on a
> gravel surface [sic].

(Doc. 6-13 at 155-156)  His opinion would not change if the car was moving at 30 or 35

mph.  And if the vehicle was moving even more slowly than that, it was far less likely

that an impact with the road would cause the severe head injury that Tina sustained.

He visited Hicks Road a few weeks before the trial, and he described it as "... still

graveled.  There are a lot of stones embedded in the surface.  The surface is literally

hard.  But again, if somebody's head is impacted on that [surface], you would see the

pattern injury coming from those gravels and the stones not only in the open wound, but

surrounding skin area.  And we don't see that."  (Doc. 6-13 at 157-158)   On cross-

examination, he conceded that he obtained information from the sheriff's office about

the incident.  He said that if that information was incomplete or incorrect, "... the cause

of death would remain the same, because it is not going to change. [If t]he

circumstances are different, than the manner would change accordingly. ... As long as

the [new] information is consistent with the head injury we are seeing, then, yes, I would

accept it as new information."  (Id. at 162)

Following Dr. Virani's testimony, the state rested.  Altman moved for a directed

verdict of acquittal, contending that the state failed to present sufficient evidence to

convict him on first or second degree murder.  He argued that there was no evidence of

premeditation or planning required for first degree murder.  And there was no evidence

of Altman committing an intentional act that is required for second degree murder.  The

prosecutor responded that intent can be inferred; he argued that Altman must have

taken some time to find an object to deliver what he called "the killing blow" to her head. The severity of the blow was itself evidence of intent to injure. The state also argued that the medical testimony and that from Ms. Hoskins established that Tina did not jump out of the car as Altman told police. A false exculpatory statement about the crime after the fact can be evidence of intent.

The trial court denied Altman's motion. The court noted that Altman had never disputed two critical facts: he was with Tina when she suffered the injury that led to her death, and the two of them were alone at that time. Those undisputed facts, combined with the state's evidence, were sufficient in the court's view to withstand the acquittal motion. The court noted the lack of definitive evidence about the location of the incident and the circumstances surrounding it, and the fact that no weapon was found. But the lack of this evidence did not mandate an acquittal on either murder charge. These facts raised some concerns about lesser included offenses and appropriate jury instructions, which the court stated it would discuss with counsel prior to instructing the jury. (Doc. 6-13 at 177-181)

On October 20, 2005, following an off-the-record conference on jury instructions and outside the presence of the jury, Altman confirmed to the court that he had been offered a plea bargain for second degree murder, and that he declined that offer. The trial court also questioned Altman about his right to testify in his own defense, and Altman acknowledged that he was voluntarily waiving that right. The court confirmed on the record its decision that the jury would be instructed on and given verdict forms for first and second degree murder, voluntary manslaughter, and involuntary manslaughter. (Doc. 6-14 at 7)

-24-

Altman's defense began on Monday, October 24, 2005 with testimony from an accident reconstruction expert, Curtis Caterer.  Caterer performed skid tests on Hicks Road to determine the road's coefficient of friction, in order to attempt to calculate the speed of Altman's car when he initially hit the brakes.   These tests were similar in kind to those described by Trooper Robbins, attempting to calculate the road surface's coefficient of friction.  After this testing and reviewing the available photographs and the measurements taken by police at the scene, Caterer opined that Altman was traveling at 24 mph at the start of the skid marks noted on Lt. Thomas's field sketch.  Caterer qualified his opinion based on some questions he had about the accuracy of the skid and tire marks as recorded on Lt. Thomas' field sketch.  He disagreed with Robbins' use of a purported acceleration mark to attempt to calculate the speed of the vehicle.  He also noted that there were no photographs of the east side of the road, where Lt. Thomas recorded marks indicating that Altman had backed his car up to a certain point. (Doc. 6-15 at 15-16)  But he believed that his opinion was a reasonable estimate of Altman's speed when the car started skidding.

Caterer also believed that the police photographs taken the night of the incident were not particularly helpful, and he criticized the fact that the area had not been cordoned off that night to prevent access by others until better photographs or more precise measurements were taken.  Caterer measured the weight of the passenger door of Altman's vehicle by weighing an exemplar door from an identical model he found at a junkyard.  The door weighed 108 pounds.  Caterer testified that if that door was opened while the car was in motion, it would quickly reach its stopping point and then "bounce back."  (Doc. 6-15 at 23)  He described an incident when he was working as an

-25-

undercover police officer.  While driving, he told a passenger in his own car that she was under arrest.  She suddenly opened her door and jumped out as he began braking. The passenger door swung open and almost immediately slammed shut.  The woman was not hit by the door, however, and she managed to get to her feet and run away.

Following Caterer's testimony, the defense rested and closing arguments were presented.  The prosecutor began by arguing that the "overwhelming evidence in this case tells you that the Defendant lied when he said on the way to McDonald's[,] Tina jumped out of that car at 45 miles an hour in a snap.  The evidence tells you that he lied.  It tells us he's a murderer."  (Doc. 6-15 at 34)  He reminded the jury of the medical and expert testimony that Tina's injuries were not consistent with her jumping out of a moving vehicle, and that Altman had refused a voluntary blood test that night.  He pointed out what he labeled as inconsistencies in Altman's story about the incident over time, and in his recorded statement to Lt. Hall.  He conceded that if the jury rejected Altman's story, there was no direct evidence of where and how Tina had been injured. He postulated a scenario that Altman inflicted the "killing blow" at Tina's house, then transported her to Hicks Road, and then to the hospital.  But he then stated that it did not matter precisely where Tina was injured, or what object may have been used to deliver the blow to her head.

In his closing, defense counsel argued that all of the physical evidence and the photos taken on Hicks Road actually supported Altman's story.  There was no evidence that the incident occurred any place but on Hicks Road.  He repeatedly argued that the police failed to do a proper investigation, failed to protect Hicks Road until a more complete inspection and investigation could be done, and simply rushed to judgment

and charged Altman with Tina's murder.  He suggested that the evidence supported the scenario that Tina was suicidal, that she suddenly exited the vehicle as Altman claimed, and was hit by the passenger door swinging shut when Altman applied the brakes.

After receiving the court's instructions, the jury retired to deliberate at 1:25 p.m. that afternoon.  At 5:25 p.m., the court reconvened to hear the verdict. The jury acquitted Altman of first degree murder, and found him guilty of second degree murder. Altman was sentenced on December 22, 2005 to a term of not less than 18 years nor more than 60 years incarceration, with credit for time already served.  (Doc. 6-16 at 42)

**Direct Appeal**

Altman timely appealed his conviction and sentence.  His initial appointed appellate counsel, Patrick Ehlmann, filed a brief raising four claims of error:

> I.  Did the trial court err reversibly by denying Defendant's motion for a directed verdict on the charge of premeditated murder?
>
> II.  Did the trial court abuse its discretion by overruling Defendant's objection to the testimony of Lt. Hall that, in his opinion, the victim did not jump out of Defendant's car?
>
> III.  Did the trial court abuse its discretion by overruling Defendant's objection to the expert testimony of Nurse Peggy Kalafut that the victim had not jumped out of a car at 40 miles per hour and hit the road?
>
> IV.  Was Defendant deprived of a fair trial by plain error by the admission of Nurse Schlaack's testimony that the victim did not appear to have jumped out of a car at 40 miles per hour?

(Doc. 6-17 at 187)   Altman's habeas co-counsel, Richard Priehs, was granted leave to file an amicus brief on behalf of Altman, presenting additional arguments on the first two claims of error.  (Doc. 6-17 at 121-176)  Altman also filed his own pro se supplemental brief, raising two additional issues:

-27-

I. Was the defendant denied his right to a fair trial by the improper
introduction of character evidence under MRE 404(a) and MRE 404(b)?

II. Was the defendant denied his constitutional right to a fair trial due to
ineffective assistance of defense counsel?

(Doc. 6-17 at 51)

Attorney Robert Dunn (Altman's habeas co-counsel) replaced Patrick Ehlmann

as Altman's appellate counsel during the briefing of the appeal, and Dunn was granted

leave to file a supplemental brief raising another claim:

Was Defendant-Appellant denied his right to a fair trial under the Fifth,
Sixth, and Fourteenth Amendments due to the closing arguments of the
prosecuting attorney, whereby said counsel repeatedly shifted the burden
of proof to defendant and Defendant's attorney, and whereby said
prosecutor continually 'vouched' to the jury that he and his witnesses
possessed superior knowledge?

(Doc. 6-17 at 28)

The Michigan Court of Appeals, in a per curiam opinion, rejected all of Altman's

claims.  (Doc. 6-17 at 1-8) The Court of Appeals summarized the facts of the case in its

opinion:

Defendant's conviction arises from the death of his girlfriend, Christina
"Tina" Fisher.  On September 28, 2004, defendant brought Fisher to a
hospital emergency room.  Fisher presented a skull fracture on the back of
her head, but showed no other injuries other than old abrasions.  Fisher
was unconscious and failed to regain consciousness before dying on
October 8, 2004.

Defendant explained to hospital personnel and to the police that Fisher
jumped from his car while they were driving on a gravel road in Midland
County.  Defendant initially told the police that he was driving 40 miles an
hour at the time.  Two treating physicians, two nurses, and the medical
examiner all testified at trial that Fisher's injuries were inconsistent with
defendant's version of events because she did not exhibit any torn
clothing, and did not have any other bruises, abrasions, or broken bones.
The prosecution's theory at trial was that Fisher died from a blow to the
head by a flat, blunt object, and that her injuries were inconsistent with

-28-

defendant's statement that she jumped out of a car moving 40 miles an hour.

(Id. at 1)

The court overruled Altman's first claim of error, finding that sufficient evidence was presented by the state to submit the first degree murder charge to the jury. The court held that the "jury reasonably could infer that defendant fabricated the roadside scene to conceal the true cause of Fisher's injuries." Moreover, the jury acquitted Altman of first-degree murder. Because the court found that there was "overwhelming evidence" supporting his second-degree murder conviction, it concluded that a jury compromise verdict was unlikely to have occurred.

Regarding Altman's claim concerning Lt. Hall, the court found that the trial court did not abuse its discretion in permitting Hall to opine that Altman was lying and that Tina did not jump out of his car. The court held that defense counsel opened the door to the prosecutor's question by closely cross-examining Hall about why he asked Altman certain questions, and by repeatedly challenging Hall's description of Altman as "evasive." Hall's opinion was permissible under Mich. R. Evid. 701, permitting a non-expert witness to offer opinion testimony that is rationally based on the witness's perception, and is helpful to understanding his testimony or determine an evidentiary fact.

Regarding the admission of testimony of the two emergency room nurses, the court of appeals concluded that the trial court did not abuse its discretion in permitting Nurse Kalafut to offer an opinion about Fisher's injuries. She has extensive experience as an emergency room nurse and has treated numerous trauma patients involved in

-29-

motor vehicle accidents.  These qualifications were sufficient to permit her to testify that Tina's injuries were inconsistent with ejection from a moving car.  Trial counsel did not object to Nurse Schlaack's testimony; for similar reasons as those recited for Nurse Kalafut, the court of appeals found no plain error in admitting her opinion.

The court then addressed Altman's claim that the trial court erroneously admitted character and prior bad acts evidence in violation of Mich. R. Evid. 404(a) and (b).  The specific incidents he cited were: (1) the excerpts of Fisher's letter read to the jury by Tina's mother, Ms. Jones; (2) Jones' testimony that she believed Altman could hurt Fisher; (3) Jones' reference to Altman's lack of visits while Tina was in the hospital; (4) Deputy Menge's testimony about the "spin marks" he observed at Tina's house; (5) testimony from Lt. Hall, and Nurses Kalafut and Schlaack that they did not believe Altman's story about how Tina was injured; (6) evidence that Altman had a relationship with his ex-wife and other women; and (7) testimony about Altman's purported refusal to pay a telephone bill that led to his moving out of a house he was living in just before the incident.  Altman's trial counsel objected only to the first, Tina's hand-written letter.

The court of appeals found that the three excerpts of the letter read to the jury reflected discord in Altman's relationship with Tina, and was relevant to suggest a motive to assault or kill her.  The court further found that the probative value of the admitted portions was not substantially outweighed by a danger of unfair prejudice to Altman.  The court rejected Altman's arguments about the balance of the challenged evidence, finding no plain error.  The court found that Altman had mischaracterized Bonnie Jones' testimony, because she did not say that she thought Altman would harm Tina.  She testified that she was initially unwilling to believe that Altman would hurt Tina:

"This testimony was relevant to explain why she did not immediately suspect or accuse defendant of assaulting Tina when she first spoke to the police.  To the extent that her testimony portrayed defendant in an unfavorable light, it was too vague and indirect to be deemed either unfairly prejudicial ... or inadmissible character evidence ...".  (Doc. 6-17 at 5) The court briefly addressed the rest of the challenged incidents, finding no plain error or a violation of Altman's substantial rights.  In addition, the court of appeals rejected Altman's assertion that the admission of evidence of Tina's good character from her co-workers unfairly prejudiced his defense by creating "a stark contrast between Fisher's allegedly good character and his own supposedly bad character."  (Id. at 6)  Altman placed Tina's mental state at issue in the case by arguing that she was self-destructive and suicidal, which led to her suddenly jumping out of his moving car. The challenged testimony was therefore relevant to counter Altman's arguments.

Regarding Altman's several sub-claims of ineffective assistance of trial counsel, the court of appeals noted that Altman did not move for a new trial, or seek an evidentiary hearing on these claims pursuant to People v. Ginther, 390 Mich. 436, 212 N.W.2d 922 (1973).[4]  Appellate review was therefore limited to mistakes that were apparent from the record.  The court of appeals concluded that trial counsel was not ineffective for failing to object to the admission of the challenged instances of character

---

[4] Ginther held: "A convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately." Ginther, 390 Mich. at 442-443, quoting People v. Jelks, 33 Mich. App. 425, 431, 190 N.W.2d 291 (1971).

evidence because the court concluded that the evidentiary objections themselves

lacked merit.  Altman argued that his attorney failed to pursue a "critical weakness" in

Lt. Hall's testimony concerning the speed that Altman was driving when Tina jumped out

of the car.  During his interview with Hall, Altman responded "Um Hum" when Hall

stated that Altman was driving at about 40 mph on Hicks Road.  Altman argued that was

the speed **before** Tina jumped, because he had applied the brakes before she actually

left the vehicle.  The court noted that decisions about witness questioning are presumed

to be strategic ones; moreover, the issue of the speed of the car was presented to the

jury through other witnesses and questions.  The court also noted:

> In any event, whether defendant was driving 40 miles [per hour] or some
> lesser speed was not a critical issue in the case.  Rather, it was the
> prosecutor's theory that [Tina's] injuries were not consistent with a fall
> from a moving vehicle, regardless of the speed.  Thus, defendant has not
> demonstrated that counsel's questioning of Hall was either deficient or
> prejudicial.

(Id. at 7)

Altman also argued that his trial counsel Duke did not investigate the presence of

a paint chip on the right rear wheel well of his car, information that he claimed his first

lawyer (Mr. Isles) had passed along to Duke.  The court of appeals found no basis to

assume that the paint chip had any exculpatory value, and there was no evidence of a

causal connection between a paint chip and Tina's injuries.

Finally, the court of appeals addressed Altman's claims of prosecutorial

misconduct, which primarily challenged statements made during the state's closing

argument.  These claims were reviewed for plain error due to a lack of

contemporaneous objection.  The court of appeals found that Altman failed to establish

-32-

any improper conduct by the prosecutor, let alone plain error, in any of the challenged conduct.  The prosecutor did not improperly shift the burden of proof by arguing to the jury that the evidence was uncontradicted, because a prosecutor may argue that inculpatory evidence is undisputed.  During his summation, the prosecutor remarked that if the jury rejected Altman's story, "We would like to know where it happened."  This was an acknowledgment that where Tina was injured, the "location of the assault," was unknown; but the court found that "this gap in the evidence did not establish reasonable doubt."  The prosecutor's comment about Altman "avoiding putting himself in a good light" was not directed to his decision not to testify, but was a comment about his behavior during his interview with Lt. Hall.  Nor did the prosecutor improperly assume facts not in evidence by arguing that "all the medical evidence" disproved defendant's version of events: "A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, but he is free to argue the evidence and all reasonable inferences arising from it as they relate to his theory of the case."  (Id. at 7-8)

The court also rejected the assertion that the prosecutor's argument contradicted Dr. Virani's preliminary hearing testimony, both because that testimony was not before the jury and because that testimony did not undermine the state's theory of the case. The prosecutor's statement, "If he's a liar, he's a killer," was not improper argument: "Viewed in context, the prosecutor was arguing that defendant lied about the cause of [Tina's] injury and, therefore, he must have inflicted the injury.  This argument comports with the law that a defendant's false exculpatory explanation may serve as evidence of guilt."  (Id. at 8)  Finally, the court rejected Altman's contention that the prosecutor improperly vouched for the reliability of the evidence.  He argued that Altman's story

-33-

was not credible and was contrary to the evidence, which was not improper.

Altman sought review of this decision from the Michigan Supreme Court, raising

three issues for review:

> I.  Whether the Court of Appeals determination that the trial court had not erred in admitting the personal opinion of three non expert witnesses without foundation as to the cause of the deceased's death to be allegedly inconsistent with 'the Defendant's lie' to use the prosecutor's characterization; and the admission of other extremely prejudicial evidence do not amount to reversible error based upon the harmful effect all this testimony had on the jury in an otherwise weak case was itself reversible.

> II.  Whether the court of appeals very limited treatment of the evidence in the record below to conclude that sufficient evidence was presented to support a verdict of murder against the Defendant was clearly erroneous since there was only erroneously admitted opinion and character testimony and the alleged lie of the Defendant which itself was a distortion of the statement and no other competent evidence.

> III.  The court of appeals clearly erred in failing to find that prosecutorial misconduct pervasive throughout the prosecutor's arguments fundamentally denied Petitioner a fair trial or that such errors were harmless and further erred in not subjecting the attempts to shift the burden of proof to the harmless beyond a reasonable doubt standard of review pursuant to *Chapman vs. California,* 386 U.S. 18 (1967) and failure to object by defense counsel constituted ineffective assistance.

(Doc. 6-18 at 3-4)

The Supreme Court denied his application, "because we are not persuaded that

the questions presented should be reviewed by this Court."  (Doc. 6-18 at 1, February

19, 2008 Order.)

## Federal Habeas Corpus Proceedings

Altman timely filed his original habeas corpus petition in the Eastern District of

Michigan on August 1, 2008, represented by Messrs. Priehs and Dunn.  The petition

raised three claims for relief:

-34-

Question I: The Court of Appeals clearly erred in failing to find that the prosecutorial misconduct pervasive throughout the prosecutor's arguments fundamentally denied petitioner a fair trial or that such errors were harmless and further erred in not subjecting the attempts to shift the burden of proof to the harmless beyond a reasonable doubt standard of review pursuant to <u>Chapman vs. California</u>, 386 U.S. 18 (1967) and failure to object by defense counsel constituted ineffective assistance.

Question II: Whether the Michigan Courts' determination that there was no error in allowing in admitting [sic] the personal opinion of three non-expert witnesses without foundation as to the cause of the deceased's death to be allegedly inconsistent with "the Defendant's lie" and the admission of other extremely prejudicial evidence did not amount to reversible error in an otherwise weak case was an unreasonable determination of the facts [sic].

Question III: Whether the Michigan Court's very limited treatment of the evidence in the record below to conclude that sufficient evidence was presented to support a verdict of murder was an unreasonable determination of the facts since the evidence consisted largely of improper opinion and character testimony involving the alleged lie of the defendant based on no other competent evidence.

(Doc. 1 at I-ii)

After the state filed its response (Doc. 5), Altman filed in the state trial court a post-conviction motion for relief from judgment, based upon newly discovered evidence. (Doc. 9)  The district court issued an order to show cause why his habeas petition should not be dismissed or stayed pending exhaustion of this claim.  Altman conceded a stay was appropriate, and the court entered an order on August 18, 2009 holding the matter in abeyance.  (Doc. 12)  The court conditioned the stay on Altman returning to district court within 60 days of fully exhausting his state remedies.

**State Court Post-Conviction Proceedings**

Altman's post-conviction motion to vacate his conviction (Doc. 26-11) raised the following Grounds for Relief:

-35-

(a) Law enforcement altered Defendant's Statement taken by Lt. Hall, adding (Affirmative) to Defendant's response, thereby creating the "Lie" as the foundation for Defendant's conviction.

(b) The corresponding impact of (a) above, detrimentally impacted the testimony of all expert and many lay witnesses, irreparably damaging James Altman's right to Due Process.

(c) The tire "Spin Marks" at the Victim's residence, testified to by Deputy Menge, recklessly or intentionally excluded crucial evidence, thereby suggesting the alleged crime occurred at the Victim's residence on Hull Road, rather than Hicks Road.

(d) The "Map" projected for the jury by Detective Wirth, wrongfully suggested the Defendant lied, taking an indirect route to his stated destination just before the Victim's injury.

(e) The Prosecutor misled the jury, procuring testimony from several expert witnesses, indicating the lack of damage to, and tissue on, victim's clothing - in areas where corresponding skin abrasions were non-existent.

(f) The myth of a single isolated skull injury, argued repeatedly by the prosecutor, was absolutely not true, again suggesting James Altman lied about the Victim voluntarily exiting his moving vehicle.

(g) Defense counsel, two business days before trial, shockingly discarded Mr. Altman's defense, never presenting it to the jury.

(h) Defense counsel Daniel Duke, at trial, did not mention the paint chip from in the right rear quarter panel of Defendant's Cougar [sic], a possible impact point for the exiting Victim.  Defendant's initial attorney, via Affidavit, indicates he forwarded this information to replacement counsel Duke.

(Doc. 26-11 at 2-3)

After this motion was briefed, Altman filed an "Ex Parte Petition" for an

evidentiary hearing, describing the witnesses and evidence he intended to present.  He

stated that he had discovered that Hicks Road had been re-graveled in September 2005

for the first time in over thirty years, a fact that was not presented at his trial.  He argued

that the condition of Hicks Road at the time that Dr. Virani and the jury saw it was very

different from its condition the night of the incident in September 2004. He also

intended to obtain records of Tina's mental health problems and treatment, suggesting

that he would have an expert review them and testify about them at the hearing. (Doc.

26-14)

The post-conviction trial court (Midland County Circuit Court Judge Lauderbach)

granted Altman an evidentiary hearing, but denied authorization for a subpoena to

obtain Tina's mental health records. (Doc. 26-16, March 2, 2010 Opinion and Order.)

Judge Lauderbach cited a Michigan statute protecting mental health records from public

disclosure absent a statutory exception, none of which applied to Altman's post-

conviction claims. Altman's due process rights could supersede the statutory privilege,

which the court noted would require balancing the interests in confidentiality of the

records with the possibility that they may contain exculpatory evidence, citing People v.

Stanaway, 446 Mich. 643, 662, 521 N.W.2d 557 (1994). The trial court stated:

> Evidence of Tina's drug use, erratic behaviors, and mental health history
> would certainly be relevant to the defense. Indeed, in support of the
> Motion, Defendant cites at least five different witnesses who testified at his
> trial that:
>
> a) the victim had 'fairly high' levels of marijuana, cocaine, and
> amphetamines in her urine;
>
> b) the victim suffered from depression and,
>
> c) the victim had entertained, and in fact spoke of, suicidal thoughts.
>
> ... This Court is of the opinion that in order to find that the sought-after
> records 'are likely to contain material information necessary to his
> defense' at this stage of the proceedings, he must articulate some basis to
> believe that the records contain information that is different than that which
> the jury already heard regarding the victim's drug use, depression and
> suicidal thoughts and by which the jury was evidently not persuaded.

-37-

(Doc. 26-16 at 4)  The court further noted that Michigan law limits the availability of post-conviction relief based on an issue that could have been raised on direct appeal, and this issue clearly could have been.  Moreover, Altman did not claim ineffective assistance of trial counsel based on this issue in his direct appeal, which the court found foreclosed any post-conviction consideration of the question.  In addition, the court was not persuaded that Altman's trial lawyer (Duke) should have sought a pre-trial subpoena for Tina's records, or if he had done so, that the request would have been granted in view of the other testimony about her mental state, her suicide attempts, and her drug use.

**Evidentiary Hearing**

The trial court held the evidentiary hearing on Altman's motion on April 22, 26, 27 and 28, 2010.  (The transcripts are filed at Doc. 26-3, 4, 5, and 6.)  Defense witnesses included Barbara Hendrickson (the employee of the Midland Sheriff's office who transcribed Lt. Hall's interview with Altman); two witnesses from the county Road Department, who testified that in addition to brining and grading, Hicks Road had been re-graveled on September 8-12, 2005, for the first time in 30 years; Deputy Menge, Det. Wirth, and Lt. Thomas; Dr. Virani; and Mr. Duke, Altman's trial counsel.  After extensive oral arguments and submission of post-hearing briefs, the trial court denied Altman's motion to vacate his conviction.  (Doc. 26-21)  The court's order first recited the limitations on post-conviction relief set forth in Mich. Ct. Rule 6.508(D).  That Rule states:

> (D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion

-38-

   (1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal ... ;

   (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

   (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

      (a)  good cause for failure to raise such grounds on appeal or in the prior motion, and

      (b)  actual prejudice from the alleged irregularities that support the claim for relief. As used in this subrule, "actual prejudice" means that,

       (I)  in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;

       (ii)  in a conviction entered on a plea of guilty, guilty but mentally ill, or nolo contendere, the defect in the proceedings was such that it renders the plea an involuntary one to a degree that it would be manifestly unjust to allow the conviction to stand;

       (iii)  in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case;

       (iv)  in the case of a challenge to the sentence, the sentence is invalid.

      The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

   The court first rejected Altman's claim that the written transcript of his interview

with Lt. Hall was either deliberately altered or inadvertently incorrect, due to the addition

of the word "(Affirmative)" after Lt. Hall's statement about the speed of Altman's car.[5]

The trial transcript established that the tape was played for the jury in open court, and

the tape recording was admitted as an exhibit.  But there was no evidence that the jury

had been provided with the written transcript.  The court noted: "It was up to the jury to

determine what was said on the tape and give it the appropriate weight."  (Doc. 26-21 at

7)  More to the point, the entire issue of "exit speed" (how fast Altman's car was moving

when Tina allegedly jumped out) was presented and argued to the jury, and it was

raised in Altman's direct appeal.  The specific argument about the alleged error in the

written transcript was not specifically raised but it was not "new" evidence, and it could

have been raised on direct appeal.  The court found that Altman did not establish good

cause for failing to raise the issue at trial or on direct appeal, or any actual prejudice

resulting from this alleged error.

Altman's second claim dealt with the state's arguments about Altman's false

exculpatory statements.  The trial court instructed the jury regarding a defendant's false

statements made to the police, an instruction based upon People v. Dandron, 70 Mich.

App. 439, 245 N.W.2d 782 (Mich. App. 1976).  The prosecutor repeatedly stated in

closing argument that if the jury found that Altman was "a liar, he's a killer."  This issue

was raised on direct appeal as part of Altman's prosecutorial misconduct claim, and the

court of appeals rejected it based on Dandron.  During the post-conviction hearing,

Altman argued that the "lie" to which the prosecutor repeatedly referred was Altman's

"lie" about the speed of the car at the moment Tina jumped (which was, he argued,

_____

[5] See *infra* at p. 5, quoting this portion of the written transcript.

based almost entirely upon the erroneous written transcript of the interview with Lt.

Hall). Judge Lauderbach rejected this argument:

> The 'lie' upon which Mr. Wolsh [the prosecutor] predicated his argument
> was not Mr. Altman's statement - or lack thereof - regarding the speed of
> the vehicle at the moment Ms. Fisher exited. Rather, as is abundantly
> clear from the record, the 'lie' to which Mr. Wolsh referred is the entire
> version of the events put forth by Defendant, e.g., that Ms. Fisher jumped,
> rolled, or fell out of the car. From the very outset of the trial, Mr. Wolsh
> made this clear.

(Doc. 26-21 at 9)  After quoting the instruction on false exculpatory statements

that the trial court gave to Altman's jury, the court further held:

> Defendant's argument - both here and in the prior appeal - that Mr. Wolsh
> improperly argued that Defendant should be convicted simply on the basis
> of his dishonest character is incorrect when considered in light of the legal
> principle established by *Dandron* and its obvious application to the facts of
> this case. That it is still being raised by Defendant following the Court of
> Appeals' unequivocal ruling against him - and the assertion of his present
> attorneys that evidence regarding a false exculpatory statement is
> tantamount to improper character evidence under MRE 404(b) - ignores
> this clear rule of law. Defendant's argument that the facts of *Dandron* are
> distinguishable from the facts of this case likewise ignores the fact that
> *Dandron* and [the] foregoing jury instruction represent the Court's
> instruction on the law and it was up to the jury to decide whether the facts
> supported application of the instruction.

(Id. at 10-11)

The court then addressed Altman's third post-conviction claim: Dr. Virani's trial

testimony would have changed if he had known that Altman's car was not moving at 40

miles per hour when Tina exited the car, and/or if he had known that Hicks Road had

been re-graveled in September 2005, about a month before Dr. Virani visited the site.

The court found that Dr. Virani's evidentiary hearing testimony did not materially differ

from his testimony at the preliminary examination or at trial. The crux of his opinion

throughout was that Tina's injuries were inconsistent with Altman's claim that she

-41-

jumped out of a moving car.  If she had done so at speeds above approximately 15

mph, there would have been additional indications of contact with the road surface

(abrasions, tears on her clothing, scratches on her belt, etc.).  Dr. Virani was asked

during the evidentiary hearing whether his opinion would change if the car had been

traveling at 13 mph.  He said it would not because he did not believe that Tina would

have sustained such a serious skull fracture at lower speeds.  The fracture could have

occurred from exiting the vehicle at 20-25 mph, but he did not believe that happened

due to the lack of other consistent injuries.  Dr. Virani was also asked during cross-

examination at the hearing if the fact that Tina was suicidal or self-destructive would

make any difference in the injuries he would expect to see as a result of jumping from a

car traveling at 15 mph.  Virani responded:

> The pattern of injury is not going to change.  The pattern of the injury is
> based on the speed and the surface.
>
> Q: So it's only if we take this away from falling from a vehicle, if I'm
> understanding you correctly, from a moving vehicle, that there might be
> other explanations for the injury that we saw?
>
> A: Yes.

(Id. at 14, quoting Dr. Virani's hearing testimony, Doc. 26-4 at 199-200.)  The court

concluded that Dr. Virani's evidentiary hearing testimony was "perfectly consistent" with

his trial testimony, that Tina's death could not have occurred as Altman claimed.

Altman therefore failed to establish any actual prejudice based on his arguments about

the surface of Hicks Road and Dr. Virani's opinions.

The court then addressed Altman's claims regarding the "spin marks" that Deputy

Menge saw in Tina's driveway the evening of the incident, and a map the prosecutor

-42-

displayed at trial to illustrate to the jury where the view would take place.  Deputy

Menge's written incident report noted that these "spin marks" pointed in an easterly

direction from Tina's house, which was the opposite direction from the one Altman and

Tina took the night of the incident.  Altman argued that prosecutor Wolsh (and/or Deputy

Menge in his testimony) recklessly or intentionally omitted this fact at trial, which then

allowed Wolsh to suggest in his closing argument that Altman committed the crime at

Tina's house and moved her to Hicks Road.  The court found that Deputy Menge's

incident report was available to Altman's trial and appellate counsel, and Altman did not

show that there was any impediment to obtaining access to that report.  Since the issue

could have been raised on direct appeal, it was not cognizable under MCR 6.508.

Moreover, Altman failed to establish good cause or actual prejudice arising from

Menge's omission of this fact; the trial court noted in that regard that the direction

Altman was going "... after leaving Hull Road prior to arriving on Hicks Road does not

impact what happened or did not happen on Hicks Road."  (Doc. 26-21 at 18)

Regarding the map of the area displayed for the jury: Michael Carpenter, who

worked in the prosecutor's office, testified at the hearing that Mr. Wolsh asked him to

help prepare a demonstrative map of the area on Power Point.  Sometime during the

trial, Wolsh told Carpenter that the Power Point animation did not work, so it is not clear

precisely what Power Point version was shown to the jury during Lt. Wirth's testimony.

(Carpenter did not attend Altman's trial.)  In any event, Carpenter recalled that Wolsh

told him that one purpose of the map was to display the most direct route from Tina's

house to the McDonald's in Midland.  The map was displayed solely as a demonstrative

aid, with no objection from Altman's trial counsel.  Altman argued that the map

-43-

prejudiced his defense because the "most direct" route included use of Dublin Road, which is a seasonal, one-track dirt or sand road.  Judge Lauderbach rejected this argument, finding that any error in displaying the map to the jury or in referring to it in closing argument, could have been raised on direct appeal and was not, foreclosing relief under Rule 6.508.  The court also found that Altman failed to show any actual prejudice arising from the use of the map, noting that the route Altman traveled the night of the incident was far less significant than where Altman's car ended up on Hicks Road.

Altman's next claim dealt with testimony from the two emergency room nurses and from Dr. Virani that Tina's clothes had no blood, tissue or stains in areas where old abrasions were noted on her body (her hip and leg area).  All of the medical witnesses agreed that the abrasions were old and pre-dated the incident.  Altman argued that the prosecutor misled the jury by asking the medical witnesses to confirm the lack of damage and absence of blood stains or skin tissue on her jeans in the areas where these old abrasions were found.  Altman also argued that Dr. Virani failed to tell the jury about bruises he had noted during Tina's autopsy.  The trial court rejected these claims. The questions about the absence of blood stains or damage to her clothes in areas where old abrasions were noted supported the prosecutor's basic theory: Tina did not jump out of the car because the lack of contemporaneous injuries and damage to her clothes did not support that scenario.  Altman's trial counsel did not object to the questions, the issue was not raised on direct appeal, and Altman did not establish any actual prejudice resulting from this testimony.

Finally, the trial court addressed and rejected Altman's multiple claims of

-44-

ineffective assistance of both trial and appellate counsel.  Trial counsel Duke's failure to

obtain Tina's mental health records (or to seek a subpoena to obtain them) was not

ineffective assistance.  The state's case was premised upon its contention that Tina did

not jump out of a car.  Why she may have jumped (e.g., she was suicidal or she was

high on drugs) was not relevant.  In addition, Duke testified at the evidentiary hearing

that he made a strategic decision not to pursue those records, and to rely on the

testimony of several witnesses who knew Tina and described her psychological

problems and her suicide attempts.  Duke said that he did not want to risk the disclosure

of medical records that might suggest that Tina was afraid of Altman, or that there had

been any physical altercations or violence between them.  Trial counsel's reasoned

decision not to seek these records was a strategic one, and therefore was not

ineffective assistance.  The trial court did not specifically address Altman's contentions

about the paint chip that he claimed Duke should have investigated; Duke testified that

he was aware of it and had talked about it with predecessor counsel, but that the issue

didn't make sense to him.  (Doc. 26-5 at 80)

    The trial court also rejected two claims of alleged ineffective assistance of

appellate counsel.  Altman claimed that his original appellate attorney (Patrick Ehlmann)

failed to raise on appeal the prosecutor's suggestion in closing argument that Tina's

house was "the crime scene."  Altman also claimed that Ehlmann "conceded" Altman's

guilt of second degree murder.  Regarding the first issue: as noted previously, the

prosecutor argued in closing that if the jury rejected Altman's explanation of Tina's

injuries, the jury might wonder where Tina's head injury occurred.  The prosecutor said

he could posit a "scenario" that the attack occurred at her house, and that Altman took

her to Hicks Road and then to the hospital.  But the prosecutor then stated: "It doesn't

matter.  I do not have to prove beyond a reasonable doubt where it happened, where

exactly.  It doesn't matter if it was 1739 [Hull] Road, if it was 301 Main, if it was 123 M-

20.  The exact location is not an element."  (Doc. 26-21 at 22, quoting closing argument,

Doc. 6-15 at 51-52.)  The court concluded that by this argument, the prosecutor did not

unfairly "move the crime scene."

Regarding the second issue: Ehlmann appealed the trial court's denial of a

directed verdict on first degree murder.  The court had denied that motion by

concluding: "The presumption embedded in the law is that the question should be

resolved by the jury to the extent that there is some evidence that, if believed by the

jury, would permit the jury to reach a conclusion of guilt."  (Doc. 26-21 at 23, quoting

from Doc. 6-13 at 175-176.)  In his appellate brief, Ehlmann argued that the state failed

to present sufficient evidence of intent to kill, of premeditation, or of deliberation.  He

also suggested that if Altman's acquittal motion had been granted, the jury would have

been prevented from reaching a compromise verdict of second degree murder.  After

discussing a number of Michigan cases addressing the quantum of evidence necessary

to establish intent, Ehlmann argued that the prosecutor's suggestion that Altman "took

time" to choose a weapon was unsupported by any evidence in the record.  None of the

medical witnesses could identify the object that struck Tina's head.  Dr. Virani testified

that either Tina's head was struck with an object, or her head came into contact with an

object (such as the road surface), but he could not say which had occurred.  There was

no evidence presented that made one scenario more likely than the other, and the injury

alone did not reasonably support a conclusion that Altman intentionally chose a weapon

and struck the blow.  After quoting <u>Wellar v. People</u>, 30 Mich. 16 (1874), which reviewed

cases discussing felonious intent where the weapon used is not typically likely to kill or

main, Ehlmann stated:

> The evidence presented at trial was, at least, equally consistent with intent
> to kill, intent to do great bodily harm, acting with wanton or willful disregard
> of the likelihood that the behavior will cause death or great bodily harm,
> gross negligence, or accident.  No evidence was presented which would
> clearly support a conclusion that the intent was to do more than great
> bodily harm.

> [The state] also argued that 'the conduct after the act' supported an
> inference of premeditation.  While this may be true in a specific case
> based on all of the evidence in that case, it is not true here.  The alleged
> post-act actions taken by Defendant are at least as consistent with
> unpremeditated murder and manslaughter as with premeditated murder.
> The motivation to hide one's criminal liability is the same for all three
> offenses.  There was clearly no evidence presented of pre-act conduct
> which would suggest deliberation or premeditation.  Inferences in support
> of a finding of premeditation or deliberation 'must have adequate basis in
> the record evidence,' ... .

(Doc. 6-17, Appellate Brief at 19-20; internal citation omitted.)

Altman's current counsel asserted in his post-conviction arguments that the court

of appeals judges gave short shrift to Altman's appeal because Ehlmann "conceded"

Altman's guilt in his brief.  Judge Lauderbach rejected this contention:

> The argument crafted by Mr. Ehlmann, when properly understood, was
> that there were facts which if believed by the jury would support a number
> of conclusions regarding the manner in which Ms. Fisher's death occurred
> - ranging from accident on one end of the spectrum to second-degree
> murder on the other - but that in no case would those facts support a
> conclusion of first-degree murder.  This is altogether different than
> 'conceding' Defendant's guilt to the offense of second-degree murder.

(Doc. 26-21 at 23)  The trial court concluded that Altman failed to establish that any of

the challenged actions by his trial or appellate attorney amounted to ineffective

assistance, and he failed to show any actual resulting prejudice.

-47-

Altman sought review of Judge Lauderbach's decision by the Michigan Court of

Appeals, and then by the Michigan Supreme Court.  Both courts summarily denied

review, finding that he had not shown an entitlement to relief under MCR 6.508(D).

(Doc. 26-8 at 1, Court of Appeals Order, September 20, 2011; Doc. 26-9, Michigan

Supreme Court Order, March 26, 2012.)

Altman then returned to federal district court on June 21, 2012, moving to

reinstate his habeas petition and filing an amended petition and brief raising the

following claims:

> **ISSUE I:  WHETHER, AT THE CLOSE OF THE 6.500 EVIDENTIARY
> HEARING, JUDGE JONATHON LAUDERBACH MADE AN
> UNREASONABLE DETERMINATION OF THE FACTS, NOT
> REVERSING DEFENDANT`S CONVICTION, WHERE THE EVIDENCE
> SHOWED RAMPANT EGREGIOUS, FALSE, DECEPTIVE, AND
> INTENTIONAL PROSECUTORIAL MISCONDUCT (EVENTS A--G), <u>AND</u>
> GROSS INEFFECTIVE ASSISTANCE OF COUNSEL, WHEREBY
> COUNSEL, CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME
> COURT LAW, DEPRIVING DEFENDANT OF HIS FIFTH AMENDMENT
> DUE PROCESS RIGHTS AND HIS SIXTH AMENDMENT RIGHT TO A
> FAIR TRIAL** [sic].**

> **ISSUE II: WHETHER, AT THE 6.500 HEARING, JUDGE LAUDERBACH
> MADE AN UNREASONABLE DETERMINATION OF THE FACTS, IN
> ACCORDANCE WITH 28 U.S.C. Section 2254(d)(1)(2) and CLEARLY
> ESTABLISHED FEDERAL LAW, CONCLUDING DEFENDANT HAD
> FAILED TO DEMONSTRATE: (1) THAT THE  CONSISTENCY OF
> HICKS ROAD WAS SIGNIFICANTLY DIFFERENT ON THE DAY OF
> THE INCIDENT AND THE DAY DR. VIRANI VISITED THE SCENE, AND
> (2) THAT DR. VIRANI WAS NOT DECEPTIVE AND HIS TESTIMONY
> DID NOT VARY IN ANY MATERIAL WAY FROM HIS TRIAL
> TESTIMONY.**

> **ISSUE III: WHETHER, AT THE 6.500 HEARING, THE JUDGE CLEARLY
> ABUSED HIS DISCRETION BY MAKING AN UNREASONABLE
> DETERMINATION OF THE FACTS (UNDER 28 U.S.C. Section
> 2254(d)(1)(2)) REGARDING EACH OF THE FOLLOWING: (a) IN
> DENYING DEFENSE'S REQUEST FOR AN ORDER AND SUBPOENA**

-48-

FOR MENTAL HEATH RECORDS UNDER PEOPLE VS. STANAWAY;
(b) FAILING TO VACATE DEFENDANT`S CONVICTION AFTER
SUBSTANTIAL TESTIMONY AT THE 6.500 HEARING CLEARLY
ESTABLISHED THE UNRELIABILITY OF THE TAPE  RECORDED
STATEMENT OF THE DEFENDANT`S ALLEGED LIE, THE ENTIRE
PREMISE OF THE PROSECUTION`S CASE AND, (c) BY
DEMONSTRATING ACTUAL BIAS TOWARD DEFENDANT DENYING
HIM HIS RIGHT TO A FAIR  HEARING UNDER THE SIXTH
AMENDMENT TO THE UNITED STATES CONSTITUTION.

ISSUE IV(a): WHETHER THE 6.500 HEARING JUDGE CLEARLY MADE
AN UNREASONABLE DETERMINATION OF THE FACTS WHEN
FINDING, BASED ON THE "DANDRON" CASE, THAT THE
PROSECUTION`S PRINCIPAL ARGUMENT THAT DEFENDANT`S
ALLEGED LIE TO A POLICE OFFICER ABOUT THE VEHICULAR
SPEED HE WAS TRAVELING COULD CONSTITUTE EVIDENCE OF
GUILT OF SECOND DEGREE MURDER.

ISSUE IV(b): (in original Brief in Support of Petition to Vacate
Conviction Pursuant to 28 U.S.C. Section 2254, ISSUE III).  WHETHER
THE TRIAL JUDGE, THOMAS LUDINGTON, CLEARLY ABUSED HIS
DISCRETION BY DENYING DEFENDANT`S REQUEST FOR A
DIRECTED VERDICT OF ACQUITTAL WHERE THERE WAS
INSUFFICIENT EVIDENCE OF MURDER AND BY ALLOWING THE
PROSECUTION`S UNHAMPERED ABUSE OF CHARACTER
EVIDENCE UNDER MCR 404 (a)(b), DEPRIVING DEFENDANT OF DUE
PROCESS OF LAW UNDER THE FIFTH AMENDMENT AND RIGHT TO
A FAIR TRIAL.

ISSUE V: DEFENDANT SHOULD BE GRANTED A NEW TRIAL BASED
ON "INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL,"
DEPRIVING DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO A
FAIR APPEAL, WHOSE ARGUMENT TO THE COURT OF APPEALS
THAT THE EVIDENCE ESTABLISHED DEFENDANT`S GUILT ON THE
SECOND DEGREE MURDER CONVICTION HE WAS APPEALING, BUT
THAT HE COULD BE RETRIED ON FIRST DEGREE WAS CLEARLY
UNREASONABLE AND IN VIOLATION OF THE CLEARLY
ESTABLISHED FEDERAL LAW, AND FOR THE JUDGE MAKING THE
UNREASONABLE DETERMINATION THAT APPELLATE COUNSEL
WAS NOT 'INEFFECTIVE' IN NOT RECOGNIZING THE ABOVE
ARGUED 'PROSECUTORIAL MISCONDUCT' AND 'INEFFECTIVE
ASSISTANCE OF COUNSEL.'

(Doc. 16 at 18-19)

The state filed a response brief and the post-conviction record (Docs. 25, 26), and Altman filed a reply (Doc. 27).  This case was then assigned to this Court in a May 14, 2014 Order from the Sixth Circuit Court of Appeals, entered after all the judges of the Eastern District of Michigan recused themselves.  (Doc. 29)

## DISCUSSION

## Standard of Review

Altman's petition is governed by the requirements of the Antiterrorism and Effective Death Penalty Act.  Under that statute, a federal court may not grant habeas corpus relief to a state prisoner unless it concludes that the state court's adjudication on the merits of the prisoner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "A state court renders an adjudication 'contrary to' clearly established federal law when it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'"  Carter v. Mitchell, 443 F.3d 517, 524 (6th Cir. 2006), citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  A state court unreasonably applies clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.

In order to find that the state court's application of federal law is "objectively unreasonable," it must be more than simply incorrect.  "To conclude that a state court's application of federal law was unreasonable, the Court must decide that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'"  Jackson v. Bradshaw, 681 F.3d 753, 759 (6th Cir. 2012), quoting Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 786 (2011).  "An unreasonable application of federal law is different from an incorrect application of federal law … Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 410-411.  The Supreme Court has emphasized that "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S.Ct. at 786 (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment).

**Procedural Default**

The doctrine of procedural default bars a habeas petitioner from raising claims that were not properly presented to the state court.  If a state court previously dismissed a state prisoner's federal claim because the prisoner failed to comply with a state procedural rule, a federal court ordinarily cannot consider the merits of that claim.  See Coleman v. Thompson, 501 U.S. 722, 729-731 (1991).  This doctrine bars habeas

review of such claims if: (1) the petitioner failed to comply with a state procedural rule; (2) the state court clearly enforces that rule; (3) the rule is an adequate and independent state ground for denying review of the federal constitutional claim; and (4) the petitioner cannot show cause and prejudice that would excuse the default.  Guilmette v. Howes, 624 F.3d 286, 290 (6th Cir. 2010)(en banc)(internal quotations omitted); Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986).

Under the fourth prong, a petitioner can excuse a default by establishing good cause for the default, and actual prejudice resulting from the constitutional error. Maupin, 785 F.2d at 139.  Alternatively, a petitioner may establish that the state court outcome amounts to a fundamental miscarriage of justice that requires habeas relief. This is a rare situation, such as when petitioner comes forward with new evidence demonstrating that a constitutional violation has probably resulted in his conviction despite his actual innocence.  Moore v. Mitchell, 708 F.3d 760, 775 (6th Cir. 2013), citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986).  The Supreme Court has noted regarding such a claim:

> Actual innocence does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

Schlup v. Delo, 513 U.S. 298, 327 (1995).

The Sixth Circuit has held that it is "well-established" that Michigan Court Rule

6.508(D) is a firmly established and regularly followed adequate and independent state
ground that precludes subsequent federal habeas review, absent a showing of cause
and prejudice.  Howard v. Bouchard, 405 F.3d 459, 477-478 (6th Cir. 2005), citing
Simpson v. Jones, 238 F.3d 399, 407-408 (6th Cir. 2000).  The post-conviction trial
court's judgment, and the orders of the Michigan Court of Appeals and Supreme Court
denying review, clearly rested on that procedural bar. This Court may not review
Altman's claims arising from Judge Lauderbach's order unless (1) Altman has
established cause for the default and actual prejudice as a result of the alleged violation
of federal law or (2) he has demonstrated that a failure to consider these claims will
result in a fundamental miscarriage of justice.

**Ineffective Assistance of Counsel**

Altman contends throughout his petition that he received constitutionally
ineffective assistance of counsel, and that ineffective assistance establishes good
cause for any actual default of his federal habeas claims.  Ineffective assistance claims
are governed by the standards articulated in Strickland v. Washington, 466 U.S. 668
(1984):

> A convicted defendant's claim that counsel's assistance was
> so defective as to require reversal of a conviction or death
> sentence has two components.  First, the defendant must
> show that counsel's performance was deficient.  This
> requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.  Second, the defendant
> must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were
> so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both
> showings, it cannot be said that the conviction or death
> sentence resulted from a breakdown in the adversary

-53-

process that renders the result unreliable.

Id. at 687.  To demonstrate the required prejudice, Altman must show a reasonable

probability that the result of his trial was unreliable due to counsel's deficient

performance.  This requires more than simply identifying additional evidence that could

have been presented, or additional questions that might have been asked of trial

witnesses.  "A reasonable probability is a probability sufficient to undermine confidence

in the outcome."  Id. at 694.  In addition, the Strickland court cautioned that:

> A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a
> strong presumption that counsel's conduct falls within the
> wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under
> the circumstances, the challenged action might be
> considered sound trial strategy.

Id. (internal quotations and citations omitted).

Similarly, to establish ineffective assistance of appellate counsel, Altman must

show that his appellate lawyer made an objectively unreasonable decision when

choosing the issues to raise in his direct appeal, and that the omitted issues were

"clearly stronger" than the issues that counsel did present.  See Smith v. Robbins, 528

U.S. 259, 286-288 (2000).

**Altman's Claims for Relief**

As an initial matter, Respondent suggests that the Court should dismiss Altman's

petition outright because it was filed more than 60 days following exhaustion of his post-

conviction claims.  (See Doc. 25 at 30-31)  The district court's conditional order staying

the case required Altman to reinstate his habeas petition within 60 days of exhaustion.

The Michigan Supreme Court denied review of the trial court's order denying post-

conviction relief on March 26, 2012; Altman's supplemental amended petition was filed

on June 21, 2012, more than 60 days later.  The Court does not condone the late filing.

But given the fact that the merits have been exhaustively briefed, and the delay was

relatively short, the Court will not dismiss on this basis in the interests of justice and will

address Altman's substantive claims.

> **ISSUE I:  WHETHER, AT THE CLOSE OF THE 6.500 EVIDENTIARY HEARING, JUDGE JONATHON LAUDERBACH MADE AN UNREASONABLE DETERMINATION OF THE FACTS, NOT REVERSING DEFENDANT'S CONVICTION, WHERE THE EVIDENCE SHOWED RAMPANT EGREGIOUS, FALSE, DECEPTIVE, AND INTENTIONAL PROSECUTORIAL MISCONDUCT (EVENTS A--G), <u>AND</u> GROSS INEFFECTIVE ASSISTANCE OF COUNSEL, WHEREBY COUNSEL, CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME COURT LAW, DEPRIVING DEFENDANT OF HIS FIFTH AMENDMENT DUE PROCESS RIGHTS AND HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL** [sic].

In his first claim, Altman argues that the post-conviction trial court (Judge

Lauderbach) unreasonably determined facts concerning Altman's assertions of

prosecutorial misconduct and ineffective assistance of trial counsel.   Altman's habeas

brief accuses the prosecutor of "deception and outright fraud" in that he "consistently

and repeatedly misrepresented facts."  (Doc. 16 at 57)   He argues that prosecutor

Wolsh "spent the entire trial deviously moving the accident scene away from Hicks

Road, as Hicks was consistent with Mr. Altman's statements."  He contends that

evidence he presents "conclusively demonstrates that Hicks Road" was in fact the

scene of Tina's accident, and that his story must therefore be true.  The evidence he

cites in support of this argument is:

> 1) the "profuse and sudden blood loss" on Hicks Road (presumably the blood pools found on the road);
>
> (2) Dr. Virani's testimony that Fisher's "head was in motion at impact";
>
> (3) a lack of evidence that Tina was injured somewhere else;
>
> (4) the spin marks Deputy Menge observed at Tina's house were not made by Altman's car;
>
> (5) Wolsh's "lie" about the demonstrative map and Dublin Road;
>
> (6) Tina's injuries were consistent with Lt. Thomas' field diagram and Altman's statement to Lt. Hall;
>
> (7a and b) Trooper Robbins used unreliable photographs and investigatory methods, resulting in false and perjured testimony; (Doc. 16 at 68);
>
> (7c) the Midland County sheriff's deputies failed to secure Hicks Road the night of the incident;
>
> (8) Wolsh introduced conflicting testimony as to whether there was one or two blood pools found on Hicks Road;
>
> (9) Wolsh misstated expert testimony when he argued that blood was on Tina's sweatshirt before she had contact with Hicks Road; and
>
> (10) Dr. Virani's testimony that Tina hitting the ground could not cause a skull fracture was not truthful, as shown by his opinion in another case about which he was questioned during the evidentiary hearing.

(Doc. 16 at 57-58)  Most of these arguments repeat contentions rejected by Judge Lauderbach and raise issues that he found were barred from post-conviction review

under Mich. Ct. Rule 6.508(D).  Nevertheless, given Altman's interlaced arguments about ineffective assistance of counsel (and because Judge Lauderbach addressed the merits of many of Altman's ineffective assistance claims), the Court will attempt to address these contentions.

(1) The issue about "sudden blood loss" is related to Altman's attacks on Wolsh's closing argument, during which Wolsh posited that Tina may have been injured someplace other than on Hicks Road.  Dr. Virani testified that Tina's head wound would have bled profusely as soon as the wound was opened, which would be consistent with the pool of blood found on Hicks Road if her wound occurred there.  If the wound happened elsewhere, the bleeding would presumably be quite visible.  Dr. Virani testified at the evidentiary hearing that "... if there was no blood found and nobody cleaned up the blood [at another location], then ... the injury did not happen at that location."  (Doc. 26-4 at 174)  From this testimony, Altman argues that Dr. Virani rejected the prosecutor's suggestion that the crime happened somewhere other than Hicks Road, but the jury was not informed of this important opinion.  He further suggests that the jury did not know that there were three searches at Tina's home, all of which found no evidence of blood stains or a crime committed there.

The Michigan court of appeals rejected Altman's prosecutorial misconduct claim based on Wolsh's suggestion that Altman injured Tina at her house and moved her to Hicks Road, finding that the argument "was supported by the evidence and reasonable inferences arising from the evidence."  (Doc. 6-17 at 8)  Judge Lauderbach specifically rejected Altman's repeated assertions that Wolsh "made Hull Road [Tina's house] the crime scene," finding these assertions had no support and were without merit.  (Doc.

-57-

26-21 at 21-22)   Altman's arguments here simply repeat arguments he made in his

post-conviction proceedings: Wolsh used "deception, lies, and false evidence" to

mislead the jury into thinking that Altman assaulted Tina at her house, then moved her

to Hicks Road.  Judge Lauderbach noted that Wolsh did not argue that Altman attacked

Tina at her house; he correctly informed the jury that the precise location where the

incident took place was not an element of the crime.  Nothing in Dr. Virani's evidentiary

hearing testimony establishes any factual  error in the court's conclusion; Virani simply

confirmed that wherever Tina's head injury took place, it would have immediately begun

bleeding copiously.

Altman is incorrect in asserting that the jury did not know about the searches of

Tina's home.  Deputy Menge testified that he searched the grounds and looked into the

lighted house that night, and saw no signs of a struggle or trouble.  Det. Wirth also

visited the house and found nothing suggesting a crime had been committed there.

Kyle Hoskins searched Tina's house a few weeks later and found no evidence of a

crime.  And Tina's mother was at the house shortly after Tina was hospitalized, and

there was no suggestion in her testimony that she found any sign of a struggle or blood

stains.

(2) The "head in motion" issue.  Altman cites an excerpt of Dr. Virani's evidentiary

hearing testimony to argue that Virani was misled by the sheriff's deputies, particularly

by Det. Wirth.  He suggests that Virani's testimony "eliminated Wolsh's baseless

'cowardly blow from behind' assertion."  (Doc. 16 at 60)  In excerpts that Altman cites in

his petition, Dr. Virani testified at trial that the pattern of Tina's injuries was "... more

consistent with that the head was in motion before ... impact.  It was not that the head

was steady and somebody came and impacted it hard with the object ... [sic]."  (Doc. 16 at 60, citing "R 21, R 59; MH 35-36.")[6]   At the evidentiary hearing, Altman's counsel asked Virani if he agreed that the crime scene "had to be somewhere else" (other than Hicks Road).   Virani responded "No, I'm saying that but ... the injury is not going along with the way I was told how it happened [sic]."  (Doc. 26-4 at 185)  Altman asserts that trial counsel was ineffective in failing to elicit and argue "this critical evidence" and that Judge Lauderbach erred in rejecting that claim.

Altman misconstrues Dr. Virani's hearing testimony.  The snippet quoted above is part of a long line of questions by Altman's counsel, repeatedly challenging Dr. Virani's opinion that Tina's death was a homicide.  Dr. Virani again confirmed that the "information" he was given that was critical to his opinion was that Tina jumped or rolled out of Altman's moving car.  Altman's trial counsel specifically noted in his closing argument to the jury that Dr. Virani's opinion was based on what he was told by the sheriff's department, and not upon any independent investigation he conducted.  (See Doc. 6-15 at 66-68)   As he had at trial, Dr. Virani testified at the post-conviction hearing that if the speed was much slower than what had been reported to him (about 40 miles per hour), the lack of Tina's other injuries could be explained but her serious skull fracture could not.  Judge Lauderbach concluded that there was no contradiction

---

[6] Altman's record citations are to exhibits he filed in support of the petition, Docs. 21 and 22, which are numbered by hand at the top of the pages.  The index of exhibits and attachments is filed at Doc. 21, pp. 1-6.  For instance, "R21" is filed at Doc. 21, p. 64, and is an excerpt from Dr. Virani's trial testimony.  "R59" is filed at Doc. 21-1,  p.53, but is not Dr. Virani's testimony.  "MH 35-36" apparently refers to "Miscellaneous Hearing," which Altman's index describes as the testimony of Barbara Hendrickson, the sheriff's employee who transcribed Altman's interview.  The Court cannot locate "MH 35-36."

between Dr. Virani's trial and evidentiary hearing testimony.  Altman's selective excerpts

of his testimony do not establish that the court's conclusion was unreasonable.

(3) In this section of his petition (dealing with the lack of evidence of any alternate

site of Tina's injury), Altman contends that Dr. Virani "blatantly impeached" himself at

the evidentiary hearing when he testified that impact with the ground "could not cause

the skull fracture, even at a slow speed."  Altman cites a decision by the Michigan Court

of Appeals in Henry Harris v. General Motors Corp., 2009 WL 4145233 (Mich. App.

2009)(unpublished).   According to that decision, Dr. Virani performed the autopsy of

Mr. Harris, who died after falling on a concrete floor in a restroom at his workplace.  The

issue in dispute in the Harris case was whether the fall was work-related, or was caused

by the decedent's own condition unrelated to his job.  Harris apparently passed out or

fainted for reasons unknown, and fell backwards from a standing position onto the

concrete floor.  Dr. Virani performed the autopsy, and "determined that the cause of

death was blunt force trauma to the back of the head which resulted in a skull fracture

and subdural hematomas on both sides."  Id. at *2.

During the evidentiary hearing, Dr. Virani was asked about Harris and given a

copy of the appellate opinion to review.  He conceded that he performed the autopsy,

and testified that he "determined that the cause of death was blunt force head trauma,

but there is no mention of any skull fracture in this."  Counsel asked Virani to "reconcile"

his opinion in Harris with his opinion in this case; Virani responded: "Again, I'm telling

you, you can fall.  You can sustain the impact and can cause the brain bruise and

subdural hemorrhage; but you cannot just sustain a skull fracture falling from the ground

[sic]. ...".  (Doc. 26-4 at 170)

-60-

Judge Lauderbach rejected Altman's contention that Virani impeached his own trial testimony.  The court observed:

> Dr. Virani testified that a human being could not suffer a skull fracture by simply falling and impacting the floor from a standing position. Defendant's attorneys then attempted to impeach Dr. Virani's testimony by citing two unpublished Court of Appeals decisions in cases in which Dr. Virani had testified.  In [Harris], Dr. Virani had apparently concluded that the decedent died as a result of blunt force head trauma after he fell from a standing position and struck his head on the floor.  Defendant's attorneys suggest that his testimony in this case cannot be reconciled with his testimony in that case.  In this regard, Defendants' attorneys appear to conflate the distinction between a blunt force trauma on the one hand and a skull fracture on the other. ... Dr. Virani's testimony in this case, e.g., that Ms. Fisher could not have suffered a *skull fracture* by exiting the vehicle at a speed of 10 to 15 miles per hour, is not inconsistent with his testimony that another person, in another case, and under different circumstances, might have suffered a blunt force trauma and died after falling down and striking his head on the floor.

(Doc. 26-21 at 14-15; emphasis in original)

It appears that Dr. Virani and Judge Lauderbach may have been incorrect in stating that Harris did not suffer a skull fracture, as the court of appeals decision states that he did.  But this mistake does not entitle Altman to relief, much less prove that Dr. Virani impeached himself or that trial counsel was ineffective.  Harris was published in November 2009, four years after Altman's trial, and would not have been available to trial counsel Duke.  Altman does not argue that Duke rendered ineffective assistance in failing to uncover each and every autopsy that Virani may have performed that involved head trauma or skull fractures, to attempt to find impeachment material.  (This Court would reject such a suggestion in any event.)

More importantly, as Judge Lauderbach further concluded, Virani's primary opinion that Tina's injuries were not consistent with her exit from a moving vehicle did

-61-

not change.  He consistently testified to that effect at the preliminary hearing, the Rule

104 hearing, at trial, and at the evidentiary hearing.  Dr. Virani conceded that it was

possible that she could sustain the head injury if the surface was very hard, the car was

moving at 20-25 mph when she jumped, **only** her head hit the road surface, and she did

not move after hitting her head in that fashion.  But he also made clear that he had  "... a

hard time to consider that when somebody jumping out of the vehicle moving at that

speed, would not roll at all. ... [T]his is going against the physics [sic].  You let anything

out of the moving object it is going to move in the same direction that the other object

has left.  And that - I do not see any other consistent injuries in that regard.  That's what

I'm saying."  (Doc. 26-4 at 180, as quoted in the trial court's order, Doc. 26-21 at 15.)

This Court also notes that the specific facts and circumstances surrounding the

Harris case, Mr. Harris's medical condition at the time of his fall, or the particular

conditions he encountered the day of his fall, are essentially unknown.  Altman does not

offer any other facts that would permit a meaningful comparison between Tina's skull

fracture and the one that Mr. Harris apparently sustained.  Altman did not present a

medical or pathology expert to contradict Dr. Virani's testimony at trial or during his

post-conviction proceedings.  One autopsy performed by Dr. Virani sometime after

Tina's autopsy, when all the facts and clinical evidence are not before the Court, does

not undermine Dr. Virani's opinion to an extent that reasonably calls into question his

veracity or the admissibility of his testimony in this case.

(4) "The Absurd 40-45 Mph Exit Speed."  (Doc. 16 at 61)  The issue of the speed

of Altman's car when Tina allegedly jumped was much disputed at trial and was the

subject of testimony there and at the evidentiary hearing.  During his interview, Lt. Hall

asked Altman about his speed several times; Altman responded that he was not an

expert, that he was not sure, and that the speeds they were discussing were only

estimates.  The jury heard that taped interview.  At trial, Deputy Kozak testified that

Altman told him he was going about 35-40 mph on Hicks Road.  Both the prosecutor

and defense counsel asked Kozak to confirm that Altman never said that Tina jumped

out of the car at that speed.  Kozak specifically admitted that he did not ask Altman that

question.  Several witnesses, friends and neighbors of Altman and Tina, testified that

Altman told them that he was going about 40 mph that evening.[7]

Despite this evidence, Altman accuses prosecutor Wolsh of deceiving the jury

and the court of appeals by arguing that Altman admitted he was traveling that fast at

the point that Tina jumped out of the car.  Altman again suggests that this deception

began with the addition of the word "Affirmative" to the written transcript of Altman's

interview with Lt. Hall.  Judge Lauderbach rejected that argument because there was no

evidence that the jury ever saw the written transcript, and because the jury heard the

tape recording and could judge for itself what Altman said or meant when he responded

"Um Hmh" to Lt. Hall's statements.  The court also rejected Altman's contention that this

deception detrimentally impacted the testimony of all expert and many lay witnesses,

thereby infringing Altman's due process rights.  Several witnesses who were not

affiliated with law enforcement or the prosecutor's office testified about what Altman had

told them about his speed that night.  Dr. Virani was exhaustively questioned about

whether his opinion would change if Altman's vehicle was moving more slowly than 40

---

[7] In addition to Dr. Bicknell, these witnesses included Adelbert Vaughn (Tina's
neighbor), Kim Megoran (Altman's friend), and Pam Kozubal (Tina's neighbor).

mph.  And Altman presented his own expert who opined that his vehicle was moving far

more slowly at the point the skid marks began.  This issue was fully aired at trial.  It was

also raised on direct appeal in the context of ineffective assistance of counsel, where

Altman argued that his trial lawyer failed to adequately exploit the weakness in Hall's

testimony concerning the speed of his car.

Altman's additional contention about the written transcript could have been raised

on direct appeal and is defaulted.  Judge Lauderbach's conclusions that he has not

established good cause for failure to do so, or any actual prejudice caused by the

addition of the word "Affirmative," are not unreasonable or contrary to clearly

established federal law.

(5) The spin marks.  Altman first asserts that Judge Lauderbach exhibited an

"unprofessional disdain for the Defense" on this issue.  (Doc. 16 at 65)  Judge

Lauderbach noted in his order that an issue about spin marks (Deputy Menge had

mentioned some spin marks he had seen in the yard of Tina's home) was raised on

direct appeal in connection with Altman's prosecutorial misconduct claim, and decided

against him.  The court then stated: "However, the new "spin" (pun intended) that

Defendant's current attorneys place on these issues merits some discussion here."

(Doc. 26-21 at 16)  This apparent attempt at humor is simply not indicative of the court's

"disdain" for Altman's defense.

That aside, Altman contends that prosecutor Wolsh and Deputy Menge

deliberately kept from the jury the fact the spin marks Menge described seeing in Tina's

driveway headed east, the opposite direction from that Altman took the night of the

incident.  This, Altman contends, resulted in significant prejudice to his defense.  He

-64-

suggests that Wolsh intentionally misrepresented this fact, denying him due process, as his omission of the direction of the marks allowed him to suggest that Altman struck Tina at her home, put her in the car, drove her to Hicks Road, took her out of the car, then picked her up and took her to the hospital.

The direction of the spin marks is noted on Deputy Menge's incident report, and he was not questioned about this at trial. Trial counsel did not object to any of the prosecutor's statements in closing arguments. Both of these issues could have been raised on direct appeal and were not. The post-conviction trial court correctly held that they were not appropriately raised under Rule 6.508(D). For the same reason, these issues are defaulted here, and Altman's ineffective assistance claim does not establish good cause to excuse that default. There is simply no evidence of any intentional omission by Deputy Menge or by the prosecutor about these spin marks. Even if trial counsel Duke had questioned Menge about the specific direction the marks were pointed, and that fact was before the jury, it does not establish or suggest that the jury would have reached a different outcome, or show that the failure to question Menge deprived Altman of a fair trial. As the post-conviction court aptly noted, "[t]he direction the vehicle traveled after leaving Hull Road prior to arriving on Hicks Road does not impact what happened or did not happen on Hicks Road." (Doc. 26-21 at 18)

(6) The demonstrative map. The demonstrative map displayed for the jury before the view was not admitted into evidence, and trial counsel did not object to its use or its depiction of the travel route. Altman contends that Wolsh deliberately misled the jury by showing this map with two different routes (as described above, one was apparently marked in red and another in blue). Wolsh's closing argument included a reference to

the route Altman took to go to McDonald's that night.  He stated: "Just a quick thing about going to McDonald's.  First the route.  It doesn't make sense.  I think I said it a little bit earlier.  You know, ... it's not the way that you would go if you were going to McDonald's.  It's a small thing, but I mean think about it in the whole context."  (Doc. 6-15 at 43)  There was no objection to this argument.  According to Altman, the "most direct" route to McDonald's would apparently include using the one-track, seasonal Dublin Road.

Judge Lauderbach held that this issue could have been raised on direct appeal and was not.  And he found that Altman did not establish good cause or actual prejudice from Wolsh's brief reference to the route in his closing argument.  This Court agrees with his conclusion that Altman has not shown any actual prejudice resulting from the map display or the prosecutor's brief reference to the route he traveled that night.

Altman then accuses Judge Lauderbach of "judicial bias" because his conclusions that Altman has not shown cause or prejudice "... fall outside the principled range of outcomes," quoting People v. McSwain, 259 Mich. App. 654, 685 (Mich. App. 2003).  In that case, the state appealed a trial court's grant of post-conviction relief under MCR 6.508(D)(3).  The Michigan Court of Appeals reversed, finding that the trial court abused its discretion in granting defendant a new trial.  Altman cites the court's discussion of the abuse of discretion standard of review, which has no direct application to this federal habeas proceeding.  As explained above, in order to overcome his procedural default on the issues regarding the "spin marks" and the demonstrative map, Altman must establish good cause for failing to raise it earlier, and actual prejudice to his defense.  Judge Lauderbach concluded that he had not satisfied either factor, and

-66-

Altman's arguments presented here do not show that those conclusions were unreasonable or contrary to established federal law under the strictures of 28 U.S.C. § 2254(d), much less show any judicial bias on the part of Judge Lauderbach.

Altman repeatedly asserts that he is "an innocent man [who] has been wrongfully convicted, due almost exclusively to the presentation of facts [by the prosecutor] that were untrue, some recklessly, but most intentionally created" by the prosecutor, in violation of his ethical duties, and by his trial counsel's failure to object to this intentional misconduct. (Doc. 16 at 73) This Court must agree with Judge Lauderbach's observation that most of Altman's arguments demonstrate a fundamental misunderstanding of the state's case against him. Many of his arguments also overlook the limitations imposed by statute and Supreme Court precedent on this Court's review of federal habeas claims. It is not enough to assert actual innocence by revisiting and rearguing evidence that was before the jury, or arguments that were rejected on direct appeal. The Michigan Court of Appeals held that the prosecutor's suggestion that the crime may have happened elsewhere, perhaps at Tina's home, was not improper. Altman's contentions do not show that conclusion was contrary to federal law.

(7) "Multiple injuries." (Doc. 16 at 74) In this section of his petition, Altman claims that Tina suffered "multiple injuries" in addition to the skull fracture. He contends that the prosecutor deceived the jury and the court of appeals by asserting that Tina had no other injuries. Dr. Virani testified at trial that during the autopsy, he noted a bruise on Tina's right shoulder and one on her right inner thigh. He thought these bruises were likely sustained at the same time as her head injury. Dr. Bicknell and the emergency room nurses testified that they saw no other serious injuries needing immediate medical

attention (no broken bones or internal injuries).  Altman now asserts that the two bruises

Dr. Virani noted were "consistent with a slow speed exit versus the alleged 40-45 mph."

(Doc. 16 at 75)  He suggests it was "likely" that there were "other concurrent" bruises on

Tina's body that would confirm his story, but his trial counsel failed to discover or

uncover this evidence.  This suggestion is sheer speculation.

        At the preliminary hearing, Dr. Virani testified that other than her head wound and

conditions related to her hospital treatment, he found "a healing abrasion in the back of

the right shoulder.  A small healing abrasion in the right groin area.  A small healing

contusion on the right side of the thigh.  A small healing bruise or contusion on the back

of the right knee and a healing abrasion on right leg." He also identified a very small

healing abrasion near the base of the right thumb.   (Doc. 6-4 at 30-31, and 33)  At trial,

Dr. Virani again described the areas of bruising and healing abrasions, some of which

were displayed in the autopsy photographs admitted into evidence.  (Doc. 6-13 at 138-

140)   Specifically, he identified a small purple bruise on the back of her right shoulder,

which he thought was the same age as the head wound.  But the rest, "... the injury on

the back of the hand, on the side of the leg, in the groin area, they are much more in

advanced healing stage.  So they were probably preexisting when this head impact

happened.  And the bruise on the right buttock ... and the right upper arm, [were]

created during the treatment part when they are trying to move her or lift her."  (Doc. 6-

13 at 147)

        The Court sees no conflict between Virani's preliminary and trial testimony.  The

jury saw the autopsy photographs of bruises and abrasions that were admitted into

evidence.  Trial counsel had the autopsy report and questioned Dr. Virani about it.  He

also argued in closing that the evidence supported Altman's story, and that the sheriff's deputies and the prosecutor "rushed to judgment" and ignored exculpatory evidence. The jury obviously did not agree.  The particular gloss that Altman now places on the bruises and abrasions does not establish that his trial counsel was ineffective, or that the prosecutor engaged in any misconduct by arguing that Tina's "only" injury was her serious skull fracture, an argument that this Court finds is consistent with the medical testimony and evidence.

Moreover, Altman did not offer any expert medical testimony that the two bruises and the severe skull fracture were consistent with what he now describes as a "low speed" exit from the vehicle.  Dr. Virani repeatedly testified that if the speed of the car was greater than 13 but less than 30 miles per hour, he would expect to see many more surface injuries, particularly abrasions to her knees, elbows, or other areas where her body impacted and hit the road.

Altman also argues that the prosecutor's questions about the **lack** of damage to Tina's clothing in the areas where old healing abrasions were noted amounted to prosecutorial misconduct intended to mislead the jury.  Judge Lauderbach rejected this argument, noting that the issue "starts with the premise that if a person is ejected from a moving vehicle ... and comes into contact with the ground in such a fashion as to have an abrasion on his or her skin, then the clothing covering the area of the abrasion would be affected in some way."  (Doc. 26-21 at 19) The court found that the testimony, read in context, was intended to show that the abrasions Dr. Virani and the medical staff noted "could not have been suffered contemporaneously with her alleged ejection from the vehicle.  In other words, aside from the two bruises that Dr. Virani noted at the time

of the autopsy, she had no injuries that were consistent with being ejected from a vehicle onto a gravel (or asphalt-like) road." (Id. at 20)

Altman's petition rehashes the arguments he made in the post-conviction proceedings about why the prosecutor's questions were improper. He offers no cogent reason to conclude that the post-conviction court's findings of fact were unreasonable. And the Court agrees with the court's conclusion that he failed to demonstrate any actual prejudice arising from this line of questioning.

(8) "Blood Pools, Movement, and V-shaped Stain." (Doc. 16 at 79)   In this section of his petition, Altman contends that the prosecutor offered unsupported speculation about what Altman did with Tina's body, and "created" a story about the significance of the blood on her sweatshirt. He argues that there was no evidence supporting the prosecutor's contention (accepted by the Michigan Court of Appeals in its decision) that Tina must have been sitting upright for some period of time after her head was injured, which created the V-shaped pattern on her sweatshirt. Altman argues that the evidence, properly viewed, supports Altman's version of the incident, and that his attorneys were ineffective in failing to object to the prosecutor's misconduct.

Altman's contentions about the prosecutor's arguments concerning the blood stains, and whether Tina was moved and when, were rejected on direct appeal in the context of Altman's prosecutorial misconduct claim. The Court of Appeals held:

> The prosecutor's argument that defendant laid Fisher on Hicks Road was supported by the evidence and reasonable inferences arising from the evidence. ... Defendant tried to explain Fisher's injury by stating that she jumped out of a moving car on Hicks Road, but there was ample evidence to establish that her injuries could not have resulted from such an event. It was reasonable for the prosecutor to infer that the blood, drag marks, and tire marks on Hicks Road were deliberately manufactured by defendant to

corroborate his version of events.

(Doc. 6-17 at 8)

Altman's petition reargues the trial evidence and the inferences that both the prosecutor and defense counsel urged the jury to draw from that evidence. None of these arguments (or Altman's repeated attacks on the honesty and integrity of the prosecutor) support a conclusion that the state court of appeals unreasonably determined the facts set forth in its opinion. Nor was the decision contrary to, or an unreasonable application of, clearly established federal law.

Prosecutorial misconduct that could support habeas relief must be egregious, and must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Bell, 525 F.3d 466, 482 (6th Cir. 2008), quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986). Even if the prosecutor's challenged conduct was improper or "universally condemned," relief is available only if the Court concludes that the misconduct was so flagrant as to render the entire trial fundamentally unfair. Bowling v. Parker, 344 F.3d 487, 512-513 (6th Cir. 2003), citing Darden. If conduct is found to be improper, the Court should then consider four factors in determining whether the conduct was flagrant and warrants reversal: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005).

The prosecutor's arguments about "blood pools" and the V-shaped blood stain did not amount to prosecutorial misconduct. Altman suggests that prosecutor Wolsh

wanted to hide the fact that the photographs of the scene on Hicks Road showed two blood pools, with some drops of blood between them.  He suggests that this fact would have contradicted the state's theory if the jury had been so informed.  But Kyle Hoskins, the state's own expert witness, testified on direct examination that the photographs taken that night showed **two blood pools**, evidence that suggested that Tina had been moved from one blood pool location to the other at some point that night.  This evidence was not concealed.  Most of the other incidents Altman cites here were raised on direct appeal and were held to be permissible argument based on the trial evidence.  Altman's accusations that the prosecutor intended to mislead the jury (and the court)  amount to speculation and conjecture based on Altman's own subjective view of the evidence and the trial testimony.  It is true that the state's case was largely based on circumstantial evidence.  No murder weapon was ever found, and no witnesses saw the couple that night.  But Altman's extended re-examination of the evidence and the prosecutor's arguments do not show that the court of appeals conclusions were factually unreasonable or in derogation of clearly established federal law.

Altman also contends that he received ineffective assistance of counsel because Duke did not question Pam Kozubal about her statement to Deputy Brandt describing what Altman told her about the incident.  He contends this evidence would have confirmed his story about how Tina was injured, and that he tried to move her from the side of the road to get her into his car.  Brandt interviewed Kozubal on October 5, 2004.  Brandt wrote in his incident report that Kozubal said that Altman called her the morning after Tina was injured: "He [Altman] sounded very upset and told Pamela what happened.  He told her that he was driving when Christina undid her seatbelt.  He

reached over and hooked it back up.  Christina then undid her seatbelt again and

stepped out of the car.  He stopped the car and ran back to her.  He couldn't move her

that far so he backed the car up and got her in the car.  Then he took her to the

emergency room."  (Doc. 21-2 at 58, cited as "R 140")   Altman suggests that if Kozubal

had been questioned about and verified that report, it would have supported Altman's

story to Lt. Hall, and would have explained the two blood pools seen in the photographs

of Hicks Road.  Altman contends his trial counsel was ineffective in failing to discover

and use this statement during Kozubal's trial testimony.

Even assuming that trial counsel's failure to use the report amounted to

ineffective assistance of counsel, Altman has not shown any resulting prejudice, that

eliciting this testimony would have changed the outcome or that its omission resulted in

an unfair trial.  Kozubal testified at trial about what Altman told her about the incident:

> [T]hey were driving into Midland.  She released her seatbelt, and he had
> put her seatbelt back on, told her to put her seatbelt back on, fastened it.
> And then she took her seatbelt back off and opened the door and jumped
> out.  He stopped and picked her up, put her in the car, took her to the
> hospital.
>
> Q: Did he tell you that he ran back to her?
>
> A: Um, I don't recall the conversation word for word.
>
> Q: Okay.  But if it's in the report with the deputy that interviewed you
> regarding this, would you have any reason to dispute that?
>
> A: I don't.
>
> Q: Okay.  And then he took her to the emergency room?
>
> A: Correct.

(Doc. 6-11 at 99-100) This testimony does not materially differ from Kozubal's statement

-73-

to Brandt.  While she omitted Altman's description of trying to move Tina, backing up

the car, and then getting her into the car, she readily conceded that if the report said he

had to run back to where Tina was lying, it was accurate.  The Court cannot reasonably

conclude that Kozubal's failure to testify about the additional detail constitutes prejudice

to Altman's defense.

When asked about Brandt's report and Kozubal's statement at the evidentiary

hearing, Duke testified:

> ... her testimony was essentially consistent with what [Altman] had told Lt.
> Hall.  She would have been, I suppose, bolstering what Jim had said, that
> he was trying to move her, which was consistent with the photographs,
> which was consistent with his statement.  And that I believe there were
> even drag marks from her shoes in the gravel as he was trying to pull her
> into the car, which was consistent with having to move her body and
> whether he set her down again and had to do something else.  There was
> also testimony that I believe that the car had been backed up, which was
> also consistent with Jim's story that he had stopped and was trying to deal
> with the situation, moved the car back, and then pulled Ms. Fisher into the
> car in order to get to the hospital.

(Doc. 26-5 at 73)  The trial testimony supports Duke's recollection.  Trooper Robbins,

the state's reconstruction expert, specifically testified that he believed Lt. Thomas' field

sketch demonstrated that "the vehicle stopped and at some point backed up and swung

out to the side," which was consistent with Altman's story.  (Doc. 6-13 at 20)  The failure

to introduce an additional bit of testimony that would be consistent with Altman's

statement to Lt. Hall and with the state's own reconstruction expert is not the sort of

critical evidence that could establish a reasonable probability of a different outcome.

Included in his arguments about the blood pools and the stains on Tina's

sweatshirt is Altman's contention that the prosecutor misled the Court of Appeals into

concluding that "[t]he evidence showed that Fisher died from an isolated injury to the

back of her head, inflicted while she was in an upright position." (Doc. 6-17 at 2) Altman contends that this factual statement "is nowhere in the transcripts." (Doc. 16 at 84) Dr. Virani testified that the wound on Tina's head would have begun bleeding immediately after impact. Kyle Hoskins testified that her sweatshirt exhibited a V-pattern blood stain, indicating that Tina was sitting upright while the bleeding was occurring. Hoskins also opined that the blood was on her sweatshirt before she came into contact with the road. The prosecutor's description of the testimony was not misleading, and it amply supports the Court of Appeals' factual statement regarding Tina's injuries. Whether the testimony (viewed as Altman contends it should be) might support a different scenario does not warrant granting Altman habeas relief.

(9) The "Alleged Clean-up of Hull." (Doc. 16 at 85) In this section of his petition, Altman argues that the prosecutor improperly suggested to the jury that Altman "destroyed evidence" of the crime he committed at Tina's house on Hull Road. Deputy Menge, Detective Wirth, and Ms. Hoskins all testified at trial that their searches at Hull Road, conducted at various times, found no evidence of a crime. The prosecutor asked Hoskins if the lack of blood stains or damage at the house meant that "nothing happened there." Hoskins responded that there are ways to clean up the signs of a struggle, and that the passage of time between the incident and her search of the house (about a month later) meant that the lack of evidence was not determinative. The same was true for Altman's car, which had been released to him and cleaned before it was repossessed and Hoskins examined it. (Doc. 6-13 at 70-72)

This is not improper questioning, nor did the prosecutor suggest that Altman had "cleaned up" evidence of the crime at Tina's house. Trial counsel did not object to the

questions to Hoskins or to the prosecutor's closing comment regarding the possible scenario that the crime may have occurred elsewhere.  But it was not ineffective assistance of counsel to fail to do so.

(10) Trooper Robbins' testimony: In this section of his petition, Altman contends that Trooper Robbins and prosecutor Wolsh "flagrantly fabricated evidence," and that his trial attorney did not detect this fabrication and failed to object to it.  (Doc. 16 at 86) This issue was not raised on direct appeal, and is procedurally defaulted as it is beyond dispute that it could have been included in the issues raised there.  Altman relies on ineffective assistance of trial counsel to avoid default.

As the Court understands this argument, Altman accuses Robbins of deliberately misleading the jury about the nature of the tire marks that were photographed on Hicks Road after the incident, and about information contained in Lt. Thomas' field sketch.  He faults Robbins for using his own work van to create tire and skid marks when he visited Hicks Road in June 2005.  And he contends that Robbins was not an "independent" witness because he is a state police officer.  Altman further suggests that the trial court ignored its "gatekeeper" function under <u>Daubert</u> when it permitted Robbins to testify as an expert.

Altman offers no new evidence to support his arguments about the accuracy and reliability of Robbins' opinions, much less to support his subjective attacks on Robbins' veracity.  The trial court held a pre-trial evidentiary hearing so that defense counsel could examine Robbins about his investigation and his opinions.  As noted previously, at the end of that hearing, defense counsel raised no Rule 702 objections and the court ruled that Robbins could testify.  The fact that Robbins is a state police officer does not

disqualify him from testifying as an expert, as Altman suggests.  That fact was clearly presented in his trial testimony, and the jury was instructed to give his testimony whatever weight it found to be appropriate.  And the fact that Robbins used his own work van to create demonstrative tire and skid marks was plainly presented to the jury in Robbins' own testimony.  Altman's contentions about accuracy of measurements, or whether Robbins improperly relied on photographs, or accepted without question the information he was given about the rate of Altman's speed, all go to the weight that the jury chose to give to Robbins' ultimate opinion, and not to the admissibility of his testimony.  Robbins was extensively cross-examined by Altman's trial counsel about these issues, and it was up to the jury to accept or reject his opinions.

Altman also argues that the jury view of the area was "completely unreliable" due to Robbins' "intentional malfeasance."  (Doc. 16 at 95-96)  He speculates that the prosecutor intentionally misled the jury by arranging the scene on Hicks Road in a manner that did not match Lt. Thomas' field sketch or the contemporaneous photographs, but matched Robbins' flawed opinions.  Altman offers absolutely no evidence or testimony to support this speculation.  The trial transcript does not suggest that Trooper Robbins was even present while the scene on Hicks Road was set up for the jury view by Lt. Thomas, who was present and who set the marker cones used to approximate the layout of his field sketch.  Defense counsel made no objection to the layout of the scene on Hicks Road, and no error regarding the view was raised on direct appeal.  Duke was questioned about this issue during the evidentiary hearing testimony, and none of his testimony gives rise to a credible claim of ineffective assistance of counsel that might serve as good cause to overcome the procedural default.  This issue

deserves no further discussion.

In the next section of his petition (Doc. 16 at 96-115), Altman reiterates his arguments that trial counsel Duke rendered constitutionally ineffective assistance, and that Judge Lauderbach erred in rejecting these assertions.  Altman cites an exchange between his counsel and Judge Lauderbach during the evidentiary hearing where the court agreed that some of the issues Altman raised (specifically, Deputy Menge's incident report stating that the "spin marks" at Tina's house pointed in a different direction) were not raised on direct appeal and decided against him.  (See Doc. 26-5 at 156-160)  That is true, but it is not enough to simply identify an issue that was not raised and previously rejected to establish an ineffective assistance claim.  The trial court repeatedly reminded Altman's counsel of the necessity of showing good cause and actual prejudice in order to reach the merits of such issues under Rule 6.508(D), because the information was available during trial and could have been raised on direct appeal.  Altman's habeas counsel asserted that he had asked appellate counsel Ehlmann to request an evidentiary hearing pursuant to People v. Ginther on certain claims of ineffective assistance of trial counsel, but Ehlmann had not done so.  Ehlmann was not called as a witness during the evidentiary hearing.

Judge Lauderbach rejected Altman's ineffective assistance claims, finding that he failed to overcome the presumption that his trial and appellate attorneys' decisions were based on sound strategy.  (Doc. 26-21 at 24)  Altman argues that conclusion was erroneous, and that he has shown both good cause and actual prejudice resulting from his attorneys' performance.

Setting aside Altman's hyperbole and accusations of intentional malfeasance,

-78-

Altman essentially contends that Duke did not conduct a thorough enough investigation; his evidentiary hearing testimony established that he lacked a trial strategy; he allegedly ignored the prosecutor's "blatant lies and deception;" he did not present complete information about the re-graveling of Hicks Road; he lacked sufficient time to prepare the case due to his assigned caseload (despite Duke's testimony to the contrary); he did not detect the "disingenuous transcription" of Altman's interview with Lt. Hall (the addition of the word "Affirmative" discussed previously); and he failed to investigate Tina's "over-the-top drug intoxication and mental illness - seizing her ability to act rationally" - which Altman argues was his "very real defense" to the murder charge. (Doc. 16 at 102)[8]

Regarding Tina's mental health records, Altman argues that it would have been impossible to determine the value of those records without obtaining and reviewing them. He contends that Duke's "last minute" decision to forego a subpoena forfeited Altman's only viable defense: that Tina committed suicide. Altman dismisses Duke's explanation of his decision not to seek the records, and accuses Judge Lauderbach of bias in finding that explanation sufficient. He cites Walker v. McQuiggan, 656 F.3d 311 (6th Cir. 2011), where the court found that petitioner was entitled to habeas relief because his lawyer did no investigation into petitioner's long history of chronic and severe mental illness and schizophrenia, and chose to abandon an insanity defense. The court concluded that petitioner was actually prejudiced by his attorney's failure to

---

[8] Altman also accuses Duke of impeaching himself at the evidentiary hearing, engaging in deceit, and assuming "the role of the prosecutor, not an advocate." (Doc. 16 at 103) These accusations are unsupported and are rejected.

(among other things) review records of his 30-year history of psychiatric treatment, failure to request an independent psychiatric evaluation as was his right under state law, and instead relying on a defense of accident and self-defense that was directly contradicted by eyewitness testimony.  That case is clearly distinguishable, given the facts that petitioner's trial counsel had about his mental condition and the serious questions that were raised prior to trial about an insanity defense.  Here, while trial counsel knew that Tina had received some psychological counseling, Altman had no absolute right to obtain her medical records.

Duke's decision not to seek these records cannot be compared to cases finding ineffective assistance based on trial counsel's utter failure to investigate a critical defense (such as interviewing alibi witnesses), or the existence of substantial mitigation evidence readily available from a defendant's family members.  That was the situation in Porter v. McCollum, 558 U.S. 30 (2009), where the Supreme Court affirmed a district court's grant of habeas relief based on ineffective assistance at sentencing.  After a night of heavy drinking, Porter killed his former girlfriend and her new boyfriend.  His trial lawyer presented one mitigation witness, Porter's ex-wife, and read a small part of a deposition.  The lawyer told the jury that Porter was not "mentally healthy" and had "other handicaps," but he did not investigate Porter's background and did not introduce any evidence or expert testimony about an illness or handicap.  In his state post-conviction proceeding, however, Porter presented extensive evidence about his extremely violent and abusive childhood.  He enlisted in the Army at age 17 to escape the violence; he served in the Korean War under extremely difficult conditions, was seriously injured twice, and received several commendations including two Purple

-80-

Hearts.  His doctor testified that he suffered serious post-traumatic stress syndrome and brain damage from his service that could cause impulsive, violent behavior.  His doctor also opined that Porter was substantially impaired in his ability to conform his conduct to law and that he suffered from an extreme mental disturbance, two of Florida's statutory mitigating circumstances.  The Supreme Court concluded that his lawyer had done nothing to advocate for Porter and that the deficiency was clearly prejudicial.  The Court found that Porter's case was **not** one in which the additional mitigating evidence "would barely have altered the sentencing profile presented to the sentencing judge ...".  Id. at 454 (quoting from Strickland, 466 U.S. at 700).

Strickland requires this Court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" when evaluating a claim of ineffective assistance of counsel.  Id., 466 U.S. at 694.  It is true that medical records cannot be meaningfully evaluated for their usefulness without knowing their contents.  But here, as Duke explained, he had to balance the possibility of finding some helpful information in Tina's records with the risk of uncovering adverse information that could have greatly bolstered the state's case, such as a documented complaint from Tina that Altman was violent or that they had physical altercations.  It was a judgment call whether or not to take that risk and try to obtain the subpoena.  Duke testified that he believed Altman's defense was better served by relying on the testimony of people who knew Tina and had observed her conduct, rather than records of her professional counselors.  This Court finds that Duke's decision does not fall outside the range of professional competence that would support a claim of ineffective assistance of trial counsel.

Concerning the surface of Hicks Road: Duke conceded that he did not investigate the specific condition of Hicks Road on the night of Tina's injury, or any changes that may have been made between the date of the incident and the time of trial. This issue could have been raised at trial, however; it is evident from the transcript that the post-conviction trial court repeatedly asked Altman's counsel to explain why this information should be considered "new" evidence, for purposes of post-conviction claims. The fact that trial counsel did not discover the re-graveling does not make it "new" evidence. Nevertheless, the court permitted Altman to present the road department witnesses, and he rejected Altman's contention that their testimony warranted post-conviction relief.

The two road department witnesses testified that about a month before trial, Hicks Road was re-graveled for the first time in 30 years. Altman suggests that because gravel was applied in September 2005, there was "no gravel" on Hicks Road on September 28, 2004, which he further suggests would explain why the medical personnel did not see any gravel in Tina's clothes or her wounds. He contends that this evidence would have resulted in a different outcome.

Hicks Road was consistently described during the trial as a dirt/gravel road. The photographs taken the night of the incident are described as showing gravel and dirt on the road surface, with larger amounts of gravel along the sides of the road. This evidence contradicts Altman's speculation that there was "no" gravel on Hicks Road in September 2004.

Moreover, in the Court's opinion, the fact of re-graveling does not lead inexorably to a conclusion that the jury would have arrived at a different result if they had been

informed of it; nor does the failure to discover this information during trial suggest that Altman received an unfair trial.  It is true that one of Altman's jurors specifically asked if the road had been re-graveled, and the information about the re-graveling was not provided during trial.  Adam San Miguel, from the Midland County road commission, testified that a typical re-graveling involves putting a "three to six inch lift" on the road's surface (Doc. 26-4 at 23), applying from 3 to 6 inches of new gravel.  When gravel is added, the road is rolled to compact the surface and tighten it.  This was done on Hicks Road on September 8-12, 2005.  Both re-graveling and re-grading generate loose stone on the surface of the road.  (Id. at 31-32)  He also explained that grading and brining "tightens the road down."  The purpose of re-grading is to re-crown the surface, to "bring as much gravel as you can back to the surface."  Brining hardens the surface, helping water sheet away from the surface of the road.  (Id. at 25-28)  Mr. San Miguel explained that grading and brining is typically done twice a year, and the road would also be routinely graded after rainfall.  (Id. at 29-30)  He explained that road crews will typically "pull shoulders" during maintenance, which he described as moving loose gravel that has been thrown to the shoulders of the road back onto the road surface.

James Young, also from the Midland County road commission, testified that the hardness of the road surface after grading and brining will vary depending on the weather conditions that follow.  If it is very dry, the brine will not last as long because regular light rain helps reactivate it and "tie it down" to the surface.  (Id. at 44)  This testimony fails to support Altman's contention that there was "no gravel" on the road the night of the incident, or that the condition of the road was so substantially changed by re-graveling that it calls into question the medical testimony about Tina's pattern of

-83-

injuries.

Altman also faults Duke for failing to document the whereabouts of Tina's sweatshirt between the night of the incident and the date that Det. Wirth gave it to Kyle Hoskins for examination. Altman argues that there was an "unexplained 23 days" during which there is no evidence about who had custody of the shirt and the circumstances under which it was maintained. Altman further suggests that even if the shirt's condition was not compromised during that time, and remained as it was when hospital staff removed it from Tina, the V-shape stain identified by Hoskins was explained by Altman's story: that he attempted to move Tina, sat her upright and bleeding while he backed up his car, then maneuvered her into the front seat. (See Doc. 16 at 114)

Altman's habeas counsel questioned Duke at the hearing whether or not he was concerned about "the chain of evidence" for the sweatshirt. Duke responded: "There was nothing that I recall giving me concern that there was something done with it or it was contaminated. So, no. I mean, in the sense that I thought something had been done with it or something was improper involving the sweatshirt, I would have raised it as an issue." When asked about the delay between the incident and the date it was examined by Kyle Hoskins, Duke said he wasn't concerned because there was no indication of a problem: "As far as I know, the Sheriff's Department had it. They collected it as evidence. And it might have taken them a few weeks to get it to the crime lab, but ... [i]t doesn't surprise me." (Doc. 26-5 at 109-110) Noting that a sheriff's report described the shirt as folded in a plastic bag four days after the incident, counsel asked if Duke would be "curious as to the possibility that that V shape may have been

formed by folding and packaging?" (Id. at 111)  Duke thought it was an interesting question.

Altman presents no independent witness or new evidence to support his speculation that something about the storage of the shirt between the night of the incident and when Det. Wirth retrieved it from the Saginaw hospital about four days later created the V-pattern.  Det. Wirth testified that he took photographs of the sweatshirt when he obtained it and placed it in the sheriff's evidence room.  Two of those photographs admitted at trial are described as the back of Tina's sweatshirt, documenting its condition at that time.  (Doc. 6-10 at 174-175)  There is simply no evidence to support Altman's hypothesis that the V-pattern was created after the shirt was removed from Tina's body, or its manner of storage or anything done to it before Lt. Wirth took his photographs.

Altman contends that Judge Lauderbach's rejection of these ineffective assistance of counsel claims "offends reason," and ignores what Altman claims are "clearly proven facts."  He asserts that the post-conviction hearing established a "reasonable probability" of a different outcome if his trial counsel had rendered effective assistance to him.  This Court has rejected each of his claims of ineffective assistance, and firmly rejects his contention that the post-conviction trial court's order "offends reason."  This Court agrees with the post-conviction trial court's conclusion that Altman has not shown actual prejudice caused by any of the alleged errors committed by his trial counsel.

For all of these reasons, Altman's first claim for relief set forth in Issue I is overruled.

-85-

**ISSUE II: WHETHER, AT THE 6.500 HEARING, JUDGE LAUDERBACH MADE AN UNREASONABLE DETERMINATION OF THE FACTS, IN ACCORDANCE WITH 28 U.S.C. Section 2254(d)(1)(2) and CLEARLY ESTABLISHED FEDERAL LAW, CONCLUDING DEFENDANT HAD FAILED TO DEMONSTRATE: (1) THAT THE  CONSISTENCY OF HICKS ROAD WAS SIGNIFICANTLY DIFFERENT ON THE DAY OF THE INCIDENT AND THE DAY DR. VIRANI VISITED THE SCENE, AND (2) THAT DR. VIRANI WAS NOT DECEPTIVE AND HIS TESTIMONY DID NOT VARY IN ANY MATERIAL WAY FROM HIS TRIAL TESTIMONY.**

**ISSUE III: WHETHER, AT THE 6.500 HEARING, THE JUDGE CLEARLY ABUSED HIS DISCRETION BY MAKING AN UNREASONABLE DETERMINATION OF THE FACTS (UNDER 28 U.S.C. Section 2254(d)(1)(2)) REGARDING EACH OF THE FOLLOWING: (a) IN DENYING DEFENSE'S REQUEST FOR AN ORDER AND SUBPOENA FOR MENTAL HEATLH RECORDS UNDER <u>PEOPLE VS. STANAWAY</u>; (b) FAILING TO VACATE DEFENDANT`S CONVICTION AFTER SUBSTANTIAL TESTIMONY AT THE 6.500 HEARING CLEARLY ESTABLISHED THE UNRELIABILITY OF THE TAPE  RECORDED STATEMENT OF THE DEFENDANT`S ALLEGED LIE, THE ENTIRE PREMISE OF THE PROSECUTION`S CASE AND, (c) BY DEMONSTRATING ACTUAL BIAS TOWARD DEFENDANT DENYING HIM HIS RIGHT TO A FAIR  HEARING UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**ISSUE IV(a): WHETHER THE 6.500 HEARING JUDGE CLEARLY MADE AN UNREASONABLE DETERMINATION OF THE FACTS WHEN FINDING, BASED ON THE "<u>DANDRON</u>" CASE, THAT THE PROSECUTION`S PRINCIPAL ARGUMENT THAT DEFENDANT`S ALLEGED LIE TO A POLICE OFFICER ABOUT THE VEHICULAR SPEED HE WAS TRAVELING COULD CONSTITUTE EVIDENCE OF GUILT OF SECOND DEGREE MURDER.**

The Court will consider these three claims together, as they all seek to challenge the trial court's factual findings regarding Altman's post-conviction petition under Mich. Ct. Rule 6.508(D).  These issues overlap in large part with the Court's discussion of Issue I above; and some of these claims of factual error appear to be questions of state law that are not cognizable under Section 2254.  But even if all of these issues are

-86-

properly before the Court, they lack merit.

Issue II again addresses the condition of Hicks Road and Dr. Virani's testimony.

Judge Lauderbach rejected Altman's contentions regarding the changed condition of

Hicks Road:

> Defendant's pre-hearing briefing suggested ... that Dr. Virani's trial testimony would have been different had he known that Hicks Road had been re-graveled after the incident but before he viewed the scene. Defendant posits that the gravel would have been more compacted, and more "asphalt like" at the time of the incident, which would explain why Ms. Fisher did not have the type of abrasions or clothing damage that would typically be observed if a person exited a moving vehicle onto a gravel road. However, the testimony from the evidentiary hearing does not support this argument.
>
> Defendant called as witnesses two representatives from the Midland County Road Commission. These witnesses acknowledged that Hicks Road was indeed resurfaced in September of 2005. They also testified, however, that Hicks Road had been grated and brined on September 1, 2004, just three weeks before the incident, and that this process would loosen the top layer of gravel to make it less "asphalt-like." Therefore, Defendant has failed to demonstrate that the consistency of Hicks Road was significantly different on the day of the incident and the day that Dr. Virani viewed the scene.
>
> Defendant apparently contends that if Ms. Fisher had exited the vehicle onto a hard "asphalt-like" surface, as he contends Hicks Road was on the date of the incident, she would not have any abrasions, or "road rash" or marks on her clothing. This is significant because three witnesses - Dr. Bicknell and nurses Kalafut and Schlaack - testified that the injuries to Ms. Fisher's body and the condition of her clothing were inconsistent with the factual proposition that she exited a moving vehicle. ... It is true, as Defendant asserts, however, that the specific questions posed to these witnesses were phrased with the specific factual predicate of exiting the vehicle at forty miles per hour. But this Court is satisfied that the witnesses who testified at the evidentiary hearing, including Detective Wirth and Dr. Virani, testified that their conclusions were not speed-dependent, and that Defendant's version of the incident is not supported by the evidence even if one assumes that Ms. Fisher exited the vehicle at a very slow rate of speed.

(Doc. 26-21 at 11-13)  Regarding Dr. Virani's testimony, the trial court concluded that

while Virani acknowledged that some assumptions he made about the consistency of

Hicks Road may have been inaccurate, his ultimate conclusion (that Tina did not jump

or roll out of a moving vehicle) did not change.  The court found that his testimony at the

evidentiary hearing "was perfectly consistent with his trial testimony: Ms. Fisher's death

could not have occurred in the manner that Defendant maintains."  (Id. at 16)

Altman argues that both of these factual determinations are clearly erroneous.

As already discussed in Issue One, his arguments assume that Hicks Road had "no"

gravel on the surface on September 28, 2004, and that it had 3-6 inches of "loose"

gravel when Dr. Virani and the jury visited in October 2005.  This assumption is not

supported by the testimony, as this Court already concluded.  The medical testimony

about the state of Tina's clothes and the pattern of her injuries was not based solely on

the absence of gravel on her clothes and body when she arrived at the hospital.  These

witnesses noted the absence of rips or tears in her clothes, the lack of what the trial

court referred to as "road rash" or fresh abrasions, and the lack of damage to her watch

and her metal belt buckle.  Their testimony and Dr. Virani's was uniform in stating that

Tina's pattern of injuries was inconsistent with the claim that she jumped out of a

moving vehicle onto a dirt/gravel road, no matter how "hard" the surface may have

been, or the specific amount of "loose gravel" that may have been on the surface of the

road at that time.

Altman also insists that Dr. Virani contradicted himself in his evidentiary hearing

testimony, and that his "credibility was impeached."  (Doc. 16 at 118)  Counsel asked

Virani why he went to Hicks Road just before trial when he had not visited that site

before he prepared his autopsy report.  Virani had no specific reason of his own, and

said that the police (apparently Trooper Robbins) asked him to go.   From this testimony, Altman argues that Virani "knew" he had a "dilemma" because "[a]dmitting his misguided trial testimony would be extremely difficult: He was thirteen months late and relied exclusively on incorrect gravel and speed data."  (Doc. 16 at 119)  These subjective attacks on Dr. Virani's credibility, premised on Altman's own view of the facts, are unsupported by the record.  Altman also accuses Det. Wirth of feeding Virani "baseless, erroneous information" about the incident, including the condition of the road and Altman's speed at the time.  And he accuses Judge Lauderbach of "unreasonably protect[ing] law enforcement" by rejecting Altman's arguments about Dr. Virani.  These accusations of intentional misconduct on the part of Det. Wirth and Judge Lauderbach are firmly rejected, as they are not supported by facts or reasoned argument.

Altman further contends that Dr. Virani's lack of credibility was established because his testimony in this case contradicts his testimony in Harris v. General Motors. This contention was discussed above in subsection (3) of Issue I (pages 60-63  infra). The Court rejects Altman's contentions that the Harris decision or Dr. Virani's hearing testimony reasonably support Altman's attack on Dr. Virani's credibility or his opinions in this case.  That conclusion fully applies to the arguments Altman makes here.

Issue III again challenges the post-conviction findings regarding Tina's mental health records, Altman's interview with Lt. Hall, and accuses Judge Lauderbach of judicial bias.  As previously discussed, Judge Lauderbach concluded that Tina's mental health records would not have been relevant to the post-conviction proceeding, because the issue was defaulted and Altman had not shown that his need to obtain those records outweighed the statutory privilege protecting them from disclosure.  Altman's

trial counsel knew that Tina was or had been seeing a counselor, and the records (if any) were available at the time of Altman's trial. Nor can Altman rely on ineffective assistance as good cause for failing to obtain the records. As stated above, Duke testified that he made a decision not to obtain them, for fear that they may have contained information harmful to Altman's defense, and because other witnesses would testify about her suicide attempts and her drug-taking behavior. This reasoned decision does not fail the <u>Strickland</u> test, and Altman has not established any error in the post-conviction court's resolution of this issue.

Judge Lauderbach's conclusions regarding Altman's interview with Lt. Hall and the written transcript are not unreasonable. Altman's objection about the purported "alteration" of the transcript could have been raised at trial and was not. Judge Lauderbach further noted that Altman raised this very issue in his unsuccessful application for leave to appeal his conviction to the Michigan Supreme Court.[9] And as previously discussed, there is no evidence that the written transcript was given to the jury; as Judge Lauderbach aptly noted, the jury "was free to believe all, none or part of what was said by either [Altman] or Lt. Hall." (Doc. 26-21 at 6)

Finally, the Court rejects Altman's conclusory assertion that Judge Lauderbach demonstrated "actual bias" towards him. He cites several comments he believes reflects such bias, as well as the court's "multiple, repeated findings [that] fall outside the principled range of outcomes." (Doc. 16 at 109) Altman faults the court for reciting in its order some communications between his chambers and Altman's counsel about

---

[9] See Doc. 6-18 at 25, Altman's Application for Leave to Appeal to the Supreme Court.

scheduling matters; a communication about possible disqualification of Judge

Lauderbach (after prosecutor Wolsh apparently accepted a position as an attorney-

referee with the Midland Circuit Court's Family Division); and about post-hearing

briefing.  (See Doc. 26-21 at 1-3)  None of the court's comments reflect, much less

establish any actual judicial bias.  In <u>Liteky v. United States</u>, 510 U.S. 540, 555-556

(1994), the Supreme Court noted that a "judge's ordinary efforts at courtroom

administration - even a stern and short-tempered judge's ordinary efforts at courtroom

administration ..." are not evidence of judicial bias.  This Court reviewed the challenged

comments, and rejects Altman's suggestion that they reflect a predisposition that is "...

so extreme as to display clear inability to render fair judgment."  <u>Johnson v. Bagley</u>, 544

F.3d 592, 597 (6th Cir. 2008), quoting <u>Liteky</u>, 510 U.S. at 551.  To the contrary, this

Court's review of the lengthy evidentiary hearing transcript reflects the court's leniency

in permitting Altman's counsel great leeway to develop a record and present arguments,

despite the court's concern that Altman had not shown good cause or actual prejudice

under MCR 6.508(D).  The court's occasional expressions of impatience do not

establish judicial bias or a predisposition to rule against Altman.  Unfavorable rulings

and Altman's apparent disagreement with Judge Lauderbach's conclusions simply do

not establish bias.

　　　Issue IV(a) contends that Judge Lauderbach erroneously found that Altman's

explanation of the incident, if found to be false by the jury, could constitute evidence of

guilt.  This revisits Altman's contentions about the prosecutor's argument that Altman

was lying when he said that Tina jumped out of the car.  Altman again repeatedly

attacks the "falsified transcription" of his interview with Lt. Hall.  As already discussed,

this entire sub-claim misconstrues the state's arguments about Altman's "lie" and

ignores the testimony from several other individuals (none of them police officers) that

Altman said he was driving about 40 mph when the incident occurred.

This issue was also raised on direct appeal in the context of a prosecutorial

misconduct claim.  The court of appeals held:

> Defendant argues that the prosecutor's statement, "If he's a
> liar, he's a killer," was an improper argument suggesting that
> he should be convicted on the basis of his dishonest
> character.  Viewed in context, the prosecutor was arguing
> that defendant lied about the cause of Fisher's injury and,
> therefore, he must have inflicted the injury.  This argument
> comports with the law that a defendant's false exculpatory
> explanation may serve as evidence of guilt.  See *People v
> Dandron*, 70 Mich. App. 439, 443-444, 245 N.W.2d 782
> (1976).

(Doc. 6-17 at 8)   Altman raised this argument in his post-conviction petition, contending

that the prosecutor's statement ("if he's a liar, he's a killer") was an improper use of

character evidence.  Judge Lauderbach found that the "lie" was not the particular speed

of Altman's car at the moment Tina allegedly jumped out; it was Altman's entire story

that Tina jumped out of the car.  In his opening statement, the prosecutor told the jurors

that if they did not believe Altman's story, they could consider the story as evidence of

guilt.  Judge Ludington instructed the jury regarding an exculpatory false statement (an

instruction based on People v. Dandron), and the court of appeals rejected this claim on

the merits.  Judge Lauderbach's order found that Altman's arguments ignored the "clear

rule of law" set forth in Dandron.  (Doc. 26-21 at 11)

Altman argues here that his case is clearly distinguishable from Dandron, where

he contends that "all of the elements of the crime were established beyond a

reasonable doubt, outside of defendant's false statement; thus, the statement could be considered as substantive evidence of guilt." (Doc. 16 at 139)  Altman notes that Dandron cited United States v. McConney, 329 F.2d 467, 470 (2d Cir. 1964), finding that a defendant's false statement was insufficient to support his conviction when the prosecutor lacked evidence of the "corpus delicti" of the crime.

Assuming this issue is cognizable here as a constitutional challenge to the sufficiency of the evidence supporting his conviction, Altman must demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law.   To succeed on an insufficiency claim, Altman must show, after viewing all of the evidence in the light most favorable to the state, that no rational trier of fact could have found him guilty beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This is a high standard of proof, and Altman fails to meet it.

In People v. Dandron, the defendant was charged with attempted breaking and entering with intent to commit larceny.  The Michigan court of appeals described the facts of the case:

> No one could contend that the evidence of guilt is overwhelming. ... A patrolling policeman testified that he sighted two men - appellant and his brother - outside a doctor's office at approximately midnight on a snowy evening.  Appellant was crouched, within one foot of a window.  His brother, standing next to the window, ran when the officer called out.  The brother returned shortly thereafter on his own initiative.  The officer stepped forward and discovered that the window was broken and partially raised.  An ashtray, later identified as an office ashtray, was found outside resting in the snow.
>
> After receiving Miranda warnings, appellant and his brother told the officer that they had taken a short cut that brought them near the doctor's office.  They heard a window break and saw two men running away from the rear

of the office.  Appellant's brother set out after the men, failed to catch them, and returned to the window only to find an officer waiting to question him.

Other officers arrived and testified that they explored the premises and found one set of fresh prints in the snow indicating a person running away from the window and one set of prints indicating a person walking back towards the window. ... No other fresh prints were seen.  The conclusion drawn by the prosecutor was that the brother had chased no one, but had instead fled when the patrolling officer shouted and then walked back when he realized his brother was in custody.

To summarize, the evidence offered to prove that defendants committed the crime consisted of a broken and raised window, the removed ashtray, defendants' presence and positioning at the window, and the proof indicating the falsity of their explanation of the events.  We find this evidence sufficient to support a conviction, for we believe that a reasonable man could conclude that all elements of the crime were established beyond a reasonable doubt.

Dandron, 70 Mich. App. at 440-441.

The court of appeals distinguished the case from two federal cases involving false exculpatory statements to law enforcement officers.  United States v. McConney, 329 F.2d 467, 470 (2d Cir. 1964), involved a prosecution under the Mann Act.  The defendant argued on appeal that the government's evidence was insufficient to sustain his conviction. The evidence at trial was that he drove his wife from New York to Mrs. Ferguson's house in Connecticut and returned home. His wife remained for two weeks and engaged in prostitution at Mrs. Ferguson's.  Defendant visited her in Connecticut on July 4 and they went to a party; he spent the night with her and returned home the next day.  He returned to Connecticut a few days later to pick up his wife and they returned to New York.  When questioned by an F.B.I. agent, defendant denied driving his wife to Connecticut, knowing Mrs. Ferguson, or being in Bridgeport anytime in the last 20 years. The trial judge denied defendant's motion to dismiss the indictment, recognizing

-94-

"the apparent deficiency of proof of the corpus delicti - the trip from Albany to Bridgeport

on the date in question for the purpose charged - but was of the opinion that the false

statements to the F.B.I. agent were sufficient to submit the case to the jury." Id. at 468.

The Second Circuit vacated McConney's conviction.  Defendant's statements to

the agent were in fact false, but were circumstantial evidence only of a conclusion that

he brought his wife to Connecticut and was there on at least two other occasions.  His

statement that he had not driven her there **for the purpose of prostitution** was not

shown to be false by any other evidence in the case:

> There was no evidence to show that appellant ever intended his wife to
> engage in prostitution or that he knew that the Ferguson's home [sic] was
> a house of prostitution.  It would place too much weight on defendant's
> extra-judicial exculpatory statement to authorize a conviction based almost
> solely on the fact that part of the statement, not involving the corpus delicti
> of the crime, was shown to be false.  The other evidence of guilt was
> extremely weak, and we do not think the statement was sufficient
> independent proof to justify denial of the motion for acquittal.

Id. at 470.

Dandron also distinguished United States v. Johnson, 513 F.2d 819 (2d. Cir

1975), where the court of appeals found that defendant's false exculpatory statements

were insufficient to support his convictions for conspiracy, and aiding and abetting the

importation of a controlled substance.  Defendant was riding with his friend in the

friend's car, returning from a visit to Canada.  A search at the border found

methamphetamine in a hidden compartment of the vehicle.  The defendant told the

border agent that he was a hitchhiker, and upon his arrest several weeks later, told

agents that he had never been in Canada.  The driver and owner of the car pled guilty

but did not implicate the defendant in obtaining or transporting the drugs.  The only

other direct evidence presented at his trial did not implicate defendant in his friend's drug purchases and transportation. The Second Circuit vacated his conviction, finding that his presence in the car, his friendship with the driver, his false exculpatory statements to the border agent and the arresting agents, and his "general lack of credibility," were not sufficient to prove his membership in a conspiracy, or that he aided and abetted his friend's criminal conduct. His false statements to the agents were circumstantial evidence of a consciousness of guilt; but "falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt." Id. at 824.

Altman insists that the evidence against him in this case falls within the holdings of McConney and Johnson, and not People v. Dandron. The Court disagrees. The trial court instructed Altman's jury that the elements of second degree murder in Michigan are: (1) Altman caused Tina's death, that she died as a result of the head injuries inflicted by Altman; (2) Altman either (a) intended to kill Tina or (b) intended to do great bodily harm to her, or (c) knowingly created a very high risk of death or great bodily harm, knowing that death or harm would be the likely result; and (3) the killing was not justified. Prior to this charge, the court instructed the jury pursuant to Dandron that if they determined that Altman's statements to the police were false, they then "must determine whether the statements relate to the elements of the crime charged. Proof of a false exculpatory statement may then be used by you to determine the guilt or the innocence of the Defendant to the charged offenses. In deciding this, and in

-96-

determining what weight you think the statements deserve, you should think about how
and when the statements were made, and about all the other evidence in the case."
(Doc. 6-15 at 110, as quoted in the post-conviction trial court's order, Doc. 26-21 at 10.)

Altman's challenged false statement was that Tina jumped out of his car on Hicks
Road and hit her head. The first element of second degree murder is causation. His
story is directly related to the causation element. Altman never denied being with Tina
when she sustained that head injury, or that they were alone at the time. Altman again
argues that the alleged "lie" repeatedly referred to by the prosecution was not his overall
story of how Tina was injured, but was only the precise speed he was traveling when
Tina allegedly jumped out of his car. As discussed previously, and as Judge
Lauderbach determined, Altman's argument is belied by the record as a whole.
Moreover, the jury heard the testimony clearly establishing that Lt. Hall did not ask and
Altman never told Lt. Hall precisely how fast he was traveling at the moment Tina
allegedly left the car. The same was true with respect to Deputy Kozak's testimony.

Altman contends that the evidence presented to the jury "does not arise above
conjecture," and that he cannot be convicted of murder unless there was evidence
independent of his statement that Tina's death was caused by criminal conduct. (See
Doc. 16 at 142) The state's case was premised on its contention that Altman's story
was not true because it was inconsistent with Tina's pattern of injuries. Dr. Bicknell, Dr.
Schell, and Dr. Virani described the severity of the blow to her head, and opined that
her head and skull injuries could not have been caused by an exit from a moving car
given the lack of other injuries suggesting that scenario. If Altman's story was rejected
by the jury as false, the severity of the injury was itself circumstantial evidence of an

-97-

intentional act.  Moreover, the Michigan Court of Appeals concluded that there was

"abundant" evidence supporting his conviction for second degree murder.  Altman's

insistence that the prosecutor deceived the jury, and that the state's witnesses lied, do

not convince this Court that the state court's conclusion was contrary to clearly

established federal law, or that he has established a valid constitutional claim that the

evidence was insufficient to support his conviction.

Issues II, III, and IV(a) are therefore overruled.

**ISSUE IV(b): (in original <u>Brief in Support of Petition to Vacate
Conviction Pursuant to 28 U.S.C. Section 2254</u>, ISSUE III).  WHETHER
THE TRIAL JUDGE, THOMAS LUDINGTON, CLEARLY ABUSED HIS
DISCRETION BY DENYING DEFENDANT`S REQUEST FOR A
DIRECTED VERDICT OF ACQUITTAL WHERE THERE WAS
INSUFFICIENT EVIDENCE OF MURDER AND BY ALLOWING THE
PROSECUTION`S UNHAMPERED ABUSE OF CHARACTER
EVIDENCE UNDER MCR 404 (a)(b), DEPRIVING DEFENDANT OF DUE
PROCESS OF LAW UNDER THE FIFTH AMENDMENT AND RIGHT TO
A FAIR TRIAL.**

In this section of his petition, Altman raises issues that he raised on direct appeal

and were rejected on the merits: the trial court erred in denying his motion for acquittal

on first degree murder, and abused its discretion in admitting improper character

evidence. A claim of error under state law cannot be raised in this federal habeas

proceedings.  A constitutional claim of insufficient evidence is cognizable here; but as

noted above, Altman must show that no rational trier of fact could have found him guilty

beyond a reasonable doubt.  The Michigan Court of Appeals concluded that based upon

all of the evidence, "... the jury could rationally infer that defendant acted on a decided

course of action rather than an unplanned impulse."   (Doc. 6-17 at 2)  Altman's

arguments that this conclusion is contrary to federal law reiterate his attacks on the

prosecutor's "lies" to the jury, Trooper Robbins' false testimony, and the "sloppy" police investigation.  He contends that the evidence and arguments he presented in his post-conviction proceedings establish that the court of appeals erred, and that no rational trier of fact, viewing the evidence that he has submitted, could find him guilty of first degree murder.

Attacks on witness credibility, or challenges to the inferences that the jury may have drawn from the properly admitted evidence, are beyond the scope of federal habeas relief.  Altman has not shown that the Michigan court of appeals decision was contrary to, or an unreasonable application, of federal law regarding his claim that submitting the first degree murder charge to the jury violated his constitutional rights.

The same conclusion applies to Altman's reasserted claim that the trial court erred in admitting improper character evidence against him.  This issue was also raised on direct appeal and rejected on the merits.  Most of the incidents he cited on direct appeal were reviewed for plain error due to lack of objection at trial.  Altman's insistence that the prosecutor's argument that he was a "liar" amounted to inadmissible comment on his character was also firmly rejected by Judge Lauderbach.  Altman has not shown that those factual conclusions were clearly erroneous, or that the state court reached a decision in conflict with clearly established federal law.

Issue IV(b) is therefore overruled.

**ISSUE V: DEFENDANT SHOULD BE GRANTED A NEW TRIAL BASED ON "INEFFECTIVE ASSISTANCE OF <u>APPELLATE</u> COUNSEL," DEPRIVING DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO A FAIR APPEAL, WHOSE ARGUMENT TO THE COURT OF APPEALS THAT THE EVIDENCE ESTABLISHED DEFENDANT`S GUILT ON THE SECOND DEGREE MURDER CONVICTION HE WAS APPEALING, BUT**

**THAT HE COULD BE RETRIED ON FIRST DEGREE WAS CLEARLY UNREASONABLE AND IN VIOLATION OF THE CLEARLY ESTABLISHED FEDERAL LAW, <u>AND</u> FOR THE JUDGE MAKING THE UNREASONABLE DETERMINATION THAT APPELLATE COUNSEL WAS NOT 'INEFFECTIVE' IN NOT RECOGNIZING THE ABOVE ARGUED 'PROSECUTORIAL MISCONDUCT' AND 'INEFFECTIVE ASSISTANCE OF COUNSEL..'**

In his fifth claim for relief, Altman contends that appellate counsel Ehlmann rendered ineffective assistance, and that Judge Lauderbach erred in rejecting his claim. In his amended petition, he initially suggests that the trial court "disallowed" a manslaughter charge to be submitted to the jury.  (See Doc. 16 at 147)  The transcript of the jury instructions read by the court at Altman's trial contradicts this assertion, as the jury was instructed to consider first and second degree murder, voluntary manslaughter, and involuntary manslaughter.  (Doc. 6-15 at 110-119)

Altman contends that his appellate attorney Ehlmann "admitted" he was guilty of second degree murder.  Judge Lauderbach rejected this assertion, and this Court has already concluded that the court's analysis of this issue was not unreasonable.  Altman further argues that Ehlmann significantly prejudiced his appeal by stating in the appellate brief that the "... proper remedy was to allow the Defendant to plead guilty either to Manslaughter or to be retried on First-Degree Murder," while Ehlmann also "... irrationally argu[ed that] the corpus delicti was never established and there was no evidence of malice required for murder ...".  (Doc. 16 at 147, citing to pp.15 and 19 of Ehlmann's direct appeal brief, Doc. 6-17.)   Altman notes that double jeopardy would prohibit his retrial on first-degree murder.

The statement to which Altman refers was included in the appellate brief's

argument on Altman's first claim on direct appeal, challenging the trial court's failure to grant a directed verdict on first degree murder.  By way of background, and as the appellate brief acknowledged, a Michigan Supreme Court decision, <u>People v. Graves</u>, 458 Mich. 476, 581 N.W.2d 229 (1998), overruled earlier law holding that if a defendant's motion for a directed verdict is erroneously denied and the jury returned a verdict on a lesser offense, prejudice to the defendant was presumed.  <u>Graves</u> replaced the automatic presumption of prejudice with a more flexible standard under which reversal may be warranted if "sufficiently persuasive indicia of jury compromise" is present.  A compromise verdict may be present if: "(1) logically irreconcilable verdicts are returned, or (2) there is clear record evidence of unresolved jury confusion, or (3) ... where a defendant is convicted of the next-lesser offense after the improperly submitted greater offense."  (Doc. 6-17 at 21, quoting from <u>Graves</u>, 458 Mich. at 487-488.)  In addition, the court must also find that the denial of an acquittal does not amount to harmless error.  In <u>Graves</u>, the defendant had not satisfied any of these three factors; he was convicted of manslaughter after the trial court improperly submitted a first-degree murder charge to his jury, and there was no evidence of jury compromise or confusion.

In view of the result in <u>Graves</u>, and based on Altman's contentions about the lack of evidence of pre-meditation and intent, Ehlmann argued:

> Absent some convincing evidence pointing to murder in the second degree, it must be concluded that the inclusion of premeditated murder as a possible verdict likely shifted the grounds of the jury's deliberations significantly and more likely than not produced the verdict at which it arrived.  More likely than not, the Court's error was prejudicial.

> The proper remedy in the instant case is suggested by the decision in

> Graves, ...[The state] should be given the option of entering a judgment of
> guilt of manslaughter or retrying Defendant on a charge of murder in the
> first degree.

(Doc. 6-17 at 22-23)

Judge Lauderbach did not address the last part of this statement in his order, and

the Court cannot locate a specific reference to it in any of Altman's post-conviction

briefs.  But treating this argument as part of Altman's claim that Ehlmann "conceded" his

guilt, this Court must conclude that the statement does not amount to ineffective

assistance.  Ehlmann was clearly attempting to bring Altman's case within the confines

of Graves, by suggesting that any prejudice from submitting the first-degree murder

charge to the jury might be dissipated if the state gave Altman the option of pleading to

the lesser offense of manslaughter.  The court of appeals did not reach this argument

because it concluded there was "abundant evidence" supporting the second degree

murder conviction, and any error in submitting the first-degree charge to the jury was

therefore harmless. This Court finds that Ehlmann's brief suggestion of giving the state

an "option" of retrial or a plea did not cause him any prejudice.  Moreover, this Court

cannot agree that the arguments Ehlmann made in the brief amount to a concession

that Altman was guilty of second degree murder.

Altman also accuses Ehlmann of failing to raise claims of prosecutorial

misconduct, and failing to seek a Ginther evidentiary hearing regarding ineffective

assistance of trial counsel.  The Michigan court of appeals addressed the prosecutorial

misconduct claims that were raised in Altman's supplemental brief (filed by his current

attorney Robert Dunn), and rejected them on the merits.  Since the claims were in fact

raised and decided, Altman was not prejudiced by Ehlmann's decisions.  As to

Ehlmann's failure to seek a <u>Ginther</u> hearing, the court of appeals reviewed the ineffective assistance claims that Altman did raise on the trial record and rejected them. And Judge Lauderbach permitted Altman to present evidence in support of his ineffective claims at his post-conviction proceeding, essentially allowing him an the evidentiary hearing that would be available under <u>Ginther</u>.  After considering the evidence presented, Judge Lauderbach rejected his claims, finding that Altman had not established actual prejudice from his counsel's performance.

A valid claim of ineffective assistance of appellate counsel can constitute good cause to excuse a procedural default.   Whether or not Ehlmann should have sought a <u>Ginther</u> hearing, the post-conviction record established that Altman did not receive ineffective assistance.  It is not ineffective assistance of appellate counsel to omit a claim that lacks substantive merit.

Finally, despite Altman's repeated contentions to the contrary, the evidence he presented in the post-conviction proceeding does not establish his claim that he is actually innocent of the crime of conviction.  Altman has not come forward with new evidence, and the Supreme Court has made it clear that a credible actual innocence claim requires a petitioner to "... show that it is more likely than not that no reasonable juror would have convicted him **in the light of the new evidence**." <u>McQuiggin v. Perkins</u>, 133 S.Ct. 1924, 1935 (2013), quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)(emphasis added).  Nor can this Court conclude that the record establishes that Altman's conviction was the result of a fundamental miscarriage of justice in the state courts.  Issue V of Altman's petition is therefore overruled.

**<u>Certificate of Appealability</u>**

Altman's supplemental petition did not request a certificate of appealability. Respondent contends that a certificate should not issue on any of Altman's claims (Doc. 25). In his reply, Altman seeks a certificate but does not identify specific issues on which he believes a certificate should be issued. The Court finds that further briefing on this question is not necessary, as the exhaustive briefs and the record are sufficient for the Court to reach a conclusion.

In order to obtain a certificate of appealability, Altman must demonstrate that reasonable jurists would debate whether his petition states a valid claim for the denial of a constitutional right. For those claims that are dismissed on a procedural ground, Altman must demonstrate that reasonable jurists would debate whether the basis for the Court's dismissal was correct. Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The standard for issuance of a certificate of appealability is higher than that applied to in forma pauperis appeals, and requires more than a simple determination that a claim is not frivolous. The Supreme Court has noted: "[O]bviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'" Barefoot v. Estelle, 463 U.S. 880, 893 at n.4 (1983) (internal citations omitted).

Given the somewhat unusual facts of Altman's case, and the nature of the alleged errors committed by his trial counsel, the Court is persuaded that the Court's resolution of Altman's ineffective assistance of trial counsel claims are debatable among reasonable jurists, and will grant a certificate on those claims. The Court will deny a

-104-

certificate on the balance of Altman's claims and issues.

## CONCLUSION

For all of the foregoing reasons, the Court **DENIES** Altman's petition for habeas corpus relief (Doc. 16).

The Court **GRANTS** a certificate of appealability on Altman's claims that he received ineffective assistance of trial counsel.  The Court denies the issuance of a certificate on the rest of his claims, as the Court concludes that reasonable jurists would not debate the Court's conclusion that those claims lack merit, or whether the basis for the Court's dismissal was correct.  Altman may seek a certificate from the Sixth Circuit Court of Appeals on the balance of his claims, pursuant to Fed. R. App. Proc. 22 and Rule 11(a) of the Rules Governing Section 2254 Cases.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: September_30, 2014                    s/Sandra S. Beckwith
                                             Sandra S. Beckwith, Senior Judge
                                             United States District Court